**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PERENCO ECUADOR LTD., | |
| *Petitioner*, | Case No. 1:19-cv-02943-KBJ |
| vs. | |
| REPUBLIC OF ECUADOR, | |
| *Respondent*. | |

**REPUBLIC OF ECUADOR'S MEMORANDUM IN SUPPORT OF ITS
PARTIAL OPPOSITION TO PETITION TO ENFORCE ARBITRAL AWARD
AND CROSS-MOTION FOR SETOFF**

Alexandre de Gramont
D.C. Bar No. 430640
DECHERT LLP
1900 K Street NW
Washington, DC  20006
Tel.: (202) 261-3300
Fax: (202) 261-3333
alexandre.deGramont@dechert.com

Michael A. Losco*
N.Y. Bar No. 5356505
Tamar Sarjveladze*
N.Y. Bar No. 5703608
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036
Tel.: (212) 698 3500
michael.losco@dechert.com
tamar.sarjveladze@dechert.com
*Pro hac vice* pending

*Counsel for Respondent*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ................................................................................ 4

    I.     THE PARTIES ................................................................................. 4

    II.    SUMMARY OF FACTS GIVING RISE TO THE ARBITRATION ................... 6

    III.   THE ARBITRATION AND THE AWARD ......................................... 8

    IV.   THE ANNULMENT PROCEEDINGS AND THE STAY OF THIS ACTION .. 11

    V.    THE TAX DEBT FOR WHICH THE REPUBLIC SEEKS SETOFF ................ 14

          A.    Ecuador's Legal Framework for Income Tax Determination and Collection ................................................................... 15

          B.    The Income Tax Claims Affirmed by the National Court of Justice ........ 17

          C.    The Pending Income Tax Claims ............................................. 20

ARGUMENT ................................................................................................ 21

    I.     THE COURT SHOULD APPLY THE RIGHT OF SETOFF IN THIS CASE ... 21

    II.    THE COURT SHOULD OFFSET PETITIONER'S TAX LIABILITY AGAINST THE ICSID AWARD CONSISTENT WITH THE *MICULA* DECISION ................................................................................... 24

    III.   PERENCO-ECUADOR IS NOT ENTITLED TO POST-JUDGMENT INTEREST BEYOND THE RATE PROVIDED PURSUANT TO 28 U.S.C. § 1961(A) ...................................................................................... 28

CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*9REN Holding S.A.R.L. v. Kingdom of Spain*,
  No. 19-cv-01871 (TSC), 2020 WL 5816012 (D.D.C. Sept. 30, 2020)...................................27

*Banco Central de Reserva del Peru v. Riggs Nat'l Bank of Washington, D.C.*,
  919 F. Supp. 13 (D.D.C. 1994) ......................................................................................22, 24

*Belize Soc. Dev. Ltd. v. Gov't of Belize*,
  668 F.3d 724 (D.C. Cir. 2012) ...............................................................................................28

*Brownley v. Peyser*,
  98 F.2d 337 (D.C. Cir. 1938) .................................................................................................23

*Citizens Bank of Maryland v. Strumpf*,
  516 U.S. 16 (1995).............................................................................................................3, 21

*In re Columbia Hosp. for Women Med. Ctr., Inc.*,
  461 B.R. 648 (Bankr. D.D.C. 2011) ......................................................................................23

*Compagnie Noga D'Importation et D'Exportation S.A. v. Russian Federation*,
  No. 00 Civ. 0632(WHP), 2008 WL 3833257 (S.D.N.Y. Aug. 15, 2008), *aff'd*,
  2009 WL 3017385 (2d Cir. Sep. 22, 2009)............................................................................22

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983).................................................................................................................22

*Marsh v. Johnson*,
  263 F. Supp. 2d 49 (D.D.C. 2003) ..........................................................................................28

*Micula v. Gov't of Romania*,
  404 F. Supp. 265 (D.D.C. 2019), *aff'd*, 805 F. Apx 1 (D.C. Cir. May 19, 2020)
  ..........................................................................................................3, 22, 24, 25, 26, 27

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*,
  863 F.3d 96 (2d Cir. 2017).......................................................................................................25

*Nashville Lodging Co. v. Resolution Trust Corp.*,
  59 F.3d 236 (D.C. Cir. 1995) .............................................................................................21, 23

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela*,
  No. 16-01533 (ABJ), 2019 WL 2185040 (D.D.C. May 21, 2019)..........................................29

*Tenaris, S.A. v. Bolivarian Republic of Venezuela*,
No. 1:18-cv-01373 (CJN), 2021 WL 1177996 (D.D.C. Mar. 29, 2021) ...............................28

*Thai Lao Lignite (Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*,
No. 10-CV-5256 (KMW) (DCF), 2016 WL 958640 (S.D.N.Y. Mar. 8, 2016)......................22

*United States v. Munsey Trust Co*,
332 U.S. 234 (1947)............................................................................................................22

*York v. United States*,
909 F. Supp. 4 (D.D.C. 1995) ........................................................................................21, 23

**Statutes**

22 U.S.C. § 1650a...........................................................................................................25, 26

28 U.S.C. § 1603...................................................................................................................4

28 U.S.C. § 1608...............................................................................................................1, 3

28 U.S.C. § 1961.....................................................................................................10, 28, 29

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ................................................................................2

Federal Rules of Civil Procedure Rule 7(b)...........................................................................1

ICSID News Release, Ecuador Ratifies the ICSID Convention (Aug. 4, 2021),
https://icsid.worldbank.org/news-and-events/news-releases/ecuador-ratifies-icsid-convention ...........................................................................................................2

Ley de Régimen Tributario Interno (LRTI) (última modificación: 31 de diciembre de 2019) (R.O. 463, 17 de noviembre de 2004) [Internal Tax Regime Law (last modification: Dec. 31, 2019) (O.J. 463, Nov. 17, 2004)] (Ecuador) ..............................15

*Perenco, Subsidiaries*, http://www.perenco.com/subsidiaries (last visited Aug 8, 2021) ...............................................................................................................................6

*Perenco*, Oilfield Technology (July 29, 2021),
https://www.oilfieldtechnology.com/drilling-and-production/29072021/ecuador-defaults-on-debt-to-perenco/ ...................................................2

Rules of the United States District Court for the District of Columbia, Rule 7 ............................1

## INTRODUCTION

Pursuant to 28 U.S.C. § 1608(d), Rule 7(b) of the Federal Rules of Civil Procedure, Rule 7 of the Rules of the United States District Court for the District of Columbia, and this Court's Minute Order dated July 28, 2021, Respondent, the Republic of Ecuador ("**Respondent**" or the "**Republic**"), hereby submits its memorandum in support of (1) its partial opposition to the Petition to Enforce Arbitral Award (ECF No. 1) ("**Petition**") filed by Perenco Ecuador Ltd. ("**Petitioner**" or "**Perenco-Ecuador**") and (2) its cross-motion for setoff (the "**Partial Opposition and Cross-Motion**").

Perenco-Ecuador—a Bahamian holding company in insolvency proceedings—owes the Republic over $40 million for income tax liability that has been fully adjudicated in the courts of Ecuador.[1]  The Republic has attempted to collect the unpaid income taxes from Perenco-Ecuador but has been unable to do so, given the entity's insolvency.  Indeed, Perenco-Ecuador's only significant asset appears to be the anticipated proceeds of the arbitral award (the "**Award**"),[2] for which it seeks enforcement in this action.  It is expected that Perenco-Ecuador will promptly transfer the Award proceeds to its ultimate beneficial owners outside Ecuador, without paying the income taxes owed to the Republic.  For those reasons and others stated below, the Republic respectfully asks this Court to offset the net amount sought by Perenco-Ecuador under the Award ($391,393,984) by the amount of Petitioner's unpaid income taxes owed to the Republic.  The

---

[1] As explained below, additional claims for income taxes that Perenco-Ecuador failed to pay are still being litigated in the Ecuadorian courts.  The Republic reserves its right to amend its cross-motion for setoff if part or all of the additional tax liability is finally adjudicated in its favor in Ecuador.  For that purpose, the Republic also asks the Court to stay enforcement against the amount of tax liability currently being litigated in the Ecuadorian courts, as stated below.  All monetary amounts stated herein are in U.S. dollars.

[2] The Award dated September 27, 2019, is attached as Exhibit A to the Declaration of Ada Fernandez Johnson In Support of Petition to Enforce Arbitral Award (Oct. 1, 2919) (ECF No. 1-1) ("**Fernandez Johnson Decl.**").

Republic's cross-claim for setoff in this case may be the only opportunity for the Republic to satisfy the substantial unpaid income taxes owed by Perenco-Ecuador, and which Perenco-Ecuador is either unwilling or unable to pay in Ecuador.

At the outset, the Republic must take issue with Perenco-Ecuador's public efforts to smear Ecuador's international standing and reputation with its false assertion—made through recent statements to the media—that Ecuador is in "full default" on its obligations under the Award."[3]  It is unfortunate, to say the least, that Petitioner is trying to put extra-judicial pressure on the new Administration in Ecuador through false and injurious public statements concerning this action.  Perenco-Ecuador has even sent a letter to the ICSID Annulment Committee—now *functus officio*—complaining that the Republic "has not paid anything to Perenco" and plans to seek setoff for Perenco-Ecuador's unpaid tax liability.[4]

---

[3] *See, e.g.*, Nicholas Woodroof, *Ecuador defaults on debt to Perenco*, OILFIELD TECHNOLOGY (July 29, 2021), https://www.oilfieldtechnology.com/drilling-and-production/29072021/ecuador-defaults-on-debt-to-perenco/ (reporting Perenco-Ecuador's assertion that Ecuador is "now in full default on its obligations under the Award").  The term "default" means "[t]he omission or failure to perform a legal or contractual duty[.]"  BLACK'S LAW DICTIONARY (11th ed. 2019).  As set forth below, the Republic has not failed to perform a legal or contractual duty to Perenco-Ecuador.  The assertion in the press release that "Ecuador's default sends a disappointing message to tribunals, committees and investors that they simply cannot trust the word of Ecuador or its most senior officials" is not only misguided hyperbole; it is a serious misrepresentation of the record aimed at damaging the Republic's political, financial, and economic standing.  The Republic reserves all rights in this matter.

[4] *See* Letter from Counsel for Perenco-Ecuador to ICSID Annulment Committee (July 29, 2021) (a copy of the Letter is attached as Exhibit 1 to the accompanying Declaration of Alexandre de Gramont (the "**de Gramont Decl.**").  Contrary to Perenco-Ecuador's insinuations, the Republic has always honored its international obligations, and maintains, to date, a spotless track record of voluntary compliance with international arbitral awards.  Moreover, the Lasso administration, which took office on May 24, 2021, re-signed the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, (the "**ICSID Convention**") on June 21, 2021.  This is a further token of Ecuador's commitment to uphold its international obligations. *See* ICSID News Release, Ecuador Ratifies the ICSID Convention (Aug. 4, 2021), https://icsid.worldbank.org/news-and-events/news-releases/ecuador-ratifies-icsid-convention.

The Republic has not "defaulted" on the Award.  As discussed below, Ecuador's Minister of Economy in the prior Administration committed to pay the Award—*if* the Award was ***not*** annulled in full or in part.  The Award ***has now been annulled in part***, including on a damages claim related to Petitioner's tax liability in Ecuador.  Furthermore, the Award had ***rejected*** Perenco-Ecuador's request that "all amounts paid by Ecuador pursuant to the Award be net of any Ecuadorian tax or other fiscal obligations."  Award, ¶¶ 61, 1023(f).  The Republic never made any commitment not to seek setoff for outstanding tax liability owed by Petitioner in Ecuador.

The Republic is therefore exercising its rights under the laws of the jurisdiction in which Perenco-Ecuador brought this action (1) to respond to the Petition under 28 U.S.C. § 1608(d), and (2) to offset the amount of the ICSID award with Perenco-Ecuador's substantial unpaid tax debt.  *See, e.g., Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995) (stating that the long-recognized right of setoff allows parties "that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A.'") (quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913)); *Micula v. Gov't of Romania*, 404 F. Supp. 3d 265, 283-84 (D.D.C. 2019) (holding that tax liability may be used to offset an ICSID award and granting the State's other claims for setoff again the ICSID award), *aff'd*, 805 F. App'x 1 (D.C. Cir. 2020).

In seeking to offset the ICSID Award with the amount of Perenco-Ecuador's unpaid income taxes, the Republic is not only exercising its legal rights in the jurisdiction where Petitioner chose to bring this action; the Republic is also fulfilling its basic obligation as a sovereign State to seek the collection of unpaid taxes on income earned from the sale of the State's natural resources.  For the reasons stated herein, the Court should offset the Award with

the unpaid income tax that Perenco-Ecuador owes to the Republic, in the amount of

$40,845,760.13.[5]  In addition to this Memorandum, the Republic's Partial Opposition and Cross-

Motion are supported by the Expert Report and Declaration of Professor Carlos Andrés Coronel

Endara, a professor at the University San Francisco de Quito USFQ, and a founding partner and

director of the Tax Division of the law firm Lexvalor Abogados in Ecuador ("**Coronel Report**")

(and accompanying exhibits); and the Declaration of Mr. Andrés Danilo Ordóñez Córdova, the

General Assistant Director for Tax Compliance in the Internal Revenue Service of the Republic

of Ecuador ("**Ordóñez Decl.**") (and accompanying exhibits).[6]

## STATEMENT OF FACTS

### I.   THE PARTIES

This action arises from a long-standing dispute between the Parties involving Perenco-

Ecuador's operation of two oil exploration and exploitation areas (or "**Blocks**") in Ecuador's

Amazonian Region.  The Republic is a foreign sovereign State as defined in the Foreign

Sovereign Immunities Act, 28 U.S.C. § 1603(a).  *See* Petition, ¶ 7.  Perenco-Ecuador is an entity

established under the laws of the Commonwealth of the Bahamas.  Petition, ¶ 6.

---

[5] In addition to setting off the Award in the amount of $40,845,760.13, the Republic also asks the Court to stay enforcement against an additional $30,671,345.44, representing the amount of further tax liability assessed against Perenco-Ecuador, but which continues to be litigated in Ecuador.  The Republic reserves its right to seek recovery (including through setoff) in this or any other Court for any other liability it has or may have against Perenco-Ecuador, including, without limitation, claims by Empresa Estatal Petróleos del Ecuador and/or other state-owned companies.

[6] As indicated above, several additional exhibits are submitted with the Mr. de Gramont's Declaration, who serves as lead counsel for the Republic in this action.  The Coronel Report and Ordóñez Decl. are submitted in their original Spanish, along with certified English translations.  The exhibits thereto are also submitted in their original Spanish, along with certified English translations of the relevant portions thereof.

Perenco-Ecuador was established in 2001 as the bottom link in a chain of Bahamian holding companies, which, at the time, were ultimately owned by two French nationals:  the late Mr. Hubert Perrodo and his eldest son, Mr. François Perrodo.  Decision on Remaining Issues of Jurisdiction and on Liability (the "**2014 Decision**"), ¶¶ 47-49.[7]  As recounted in the 2014 Decision, Mr. Hubert Perrodo tragically died in a climbing accident in France in 2006.  *Id*. ¶ 48.  According to the Arbitral Tribunal, at the time of his death, Perenco-Ecuador was part of the following corporate structure:

a) Its sole shareholder was Perenco Gabon S.A[.] (formerly Perenco S.A[.]), also incorporated in the Commonwealth of the Bahamas.

b) Perenco Gabon, S.A[.], in turn, was wholly owned by Perenco S.A. (formerly Perenco Oil and Gas), also incorporated in the Commonwealth of the Bahamas.

c) Perenco S.A[.] was wholly owned by Perenco International Limited ("**PIL**"), also incorporated in the Commonwealth of the Bahamas.

d) 92.9% of the registered shares of PIL were owned by Mr. Hubert Perrodo and the remaining 7.1% of the shares were owned by another Bahamian company, Glenmor Energy Limited, whose sole shareholder was Mr. François Perrodo, Mr. Hubert Perrodo's eldest son. Mr. Hubert Perrodo gifted 7.1% of the shares in PIL to his son in 2004.

*Id*. ¶ 49 (boldface in original) (citations omitted).

As explained by the Tribunal in its 2014 Decision, Mr. Hubert Perrodo died intestate.  *Id*. ¶ 50.  His death resulted in a protracted dispute between Mr. Hubert Perrodo's spouse and three children (including Mr. François Perrodo) as to how the estate should be divided.  *Id*. ¶¶ 50-53, 120, 168, 455-57.  Because Perenco-Ecuador is still privately held, the Republic has limited insight into its current upstream ownership.  According to documents available in the public record, Perenco-Ecuador is still owned by several other Bahamian holding companies, which are

---

[7] Petitioner has submitted a copy of the Tribunal's 2014 Decision as Exhibit B to Fernandez Johnson Decl. (ECF No. 1-3).

in turn majority-owned by what is opaquely described as the "Perenco Family and Trusts."  *See* de Gramont Decl., Ex. 2.[8]  As a result, it is currently unknown whether the Republic could seek to enforce Perenco-Ecuador's outstanding tax liabilities against any of its upstream shareholders or beneficial owners.  Again, the Republic has not been able to satisfy Perenco-Ecuador's tax debts in Ecuador, due to the entity's insolvency.  *See* Ordóñez Decl., ¶¶ 43-45.

## II.    SUMMARY OF FACTS GIVING RISE TO THE ARBITRATION

As set forth by the Arbitral Tribunal's Decision on Jurisdiction dated June 30, 2011 (the "**2011 Decision on Jurisdiction**"), Perenco-Ecuador commenced its activities in Ecuador in 2002, when it acquired interests in two "Participation Contracts" for the exploration and exploitation of oil reserves in Ecuador's Amazon Region.  2011 Decision on Jurisdiction ¶ 13.[9]  As explained by the Tribunal, under a Participation Contract, a "private contractor assumes all the risks and costs of the exploration and exploitation of oil reserves in the area designated by the contract and, in exchange, has the right to receive a share of the revenue of the oil produced."  *Id*. ¶ 10.  The two Participation Contracts covered areas designated as, respectively, Blocks 7 and 21.  *Id*. ¶ 12.

Shortly after acquiring its interests in the Participation Contracts, Perenco-Ecuador entered into separate "Joint Operating Agreements" with the two other entities that then held interests in Blocks 7 and 21:  Burlington Resources Oriente Limited ("**Burlington**") and

---

[8] Perenco's website (www.perenco.com) lists numerous subsidiaries, as well as numerous countries where the "Perenco Group" has exploration and development activities.  But the website includes *no* reference to Perenco-Ecuador (or to any assets held by Perenco-Ecuador) and does not identify any assets in Ecuador.  *See Perenco, Subsidiaries*, http://www.perenco.com/subsidiaries (last visited Aug 8, 2021).

[9] The Tribunal's Decision on Jurisdiction is attached as Exhibit 3 to the de Gramont Decl. Perenco-Ecuador acquired its interests in Blocks 7 and 21 from Kerr-McGee Ecuador Energy Company in 2002.  2014 Decision, ¶ 70.

Preussag Energie GMHB ("**Preussag**").  2014 Decision, ¶ 72.  Under the Joint Operating

Agreements, Perenco-Ecuador became the sole operator (the "**Operator**") and the majority

shareholder of rights in both Blocks.  *Id.*; 2011 Decision on Jurisdiction, ¶ 13.  Perenco-

Ecuador's responsibilities as Operator included the management of joint operations, as well as

the distribution of profits and the administration of joint debts and expenses.  2014 Decision

¶ 72.

In 2005, Perenco-Ecuador, Burlington, and Preussag entered into a Consortium

Agreement "to comply with Ecuadorian tax requirements intended to simplify income tax

auditing and collection[.]"  *Id*.  The Consortium Agreement became effective on January 1, 2006.

*Id*.  In the meantime, Perenco-Ecuador and Burlington acquired Preussag's interests in Blocks 7

and 21, so that Perenco-Ecuador and Burlington were the only Consortium members with

interests in those two Blocks.  *Id*. ¶ 73.  Perenco-Ecuador continued to hold the majority interests

in both Blocks.  *Id*.  Perenco-Ecuador also continued to act as the Operator for the Consortium.[10]

After Perenco-Ecuador acquired its interests in Blocks 7 and 21, international oil prices

started to rise "dramatically."  *Id*. ¶ 81.  As stated by the Arbitral Tribunal, in 2002, the price of

Ecuadorian crude was "fluctuating around US $15/bbl."  *Id*. ¶ 82.  "By 2005, however, prices

had more than tripled, reaching US $50/bbl."  *Id*. (citations omitted).  The price of Ecuadorian

crude reached nearly US $90/bbl. in March 2008 and soared to almost US $120/bbl. in June

2008.  *Id*. ¶ 83.  Although the global financial crisis caused oil prices to drop through the end of

---

[10] As discussed further below, as Operator of the Blocks, Perenco-Ecuador was responsible for
filing annual consolidated tax returns and paying income taxes on behalf of itself, Burlington,
and Preussag *before* the formation of the Consortium.  After the formation of the Consortium
(effective on January 1, 2006), Perenco-Ecuador was responsible as the Operator for filing
annual consolidated tax returns and paying income taxes on behalf of the Consortium.

2008 and at the beginning of 2009, oil prices quickly started to recover, stabilizing "in the range of US $60-70/bbl for most of 2009 and 2010." *Id.*

The dramatic increase in oil prices led to the perception in Ecuador that the oil companies operating there were earning revenues far beyond what was envisioned under the Participation Contracts—and that Ecuador should share in those increased revenues as well. As a result, between 2006 and 2008, the Ecuadorian governments then in place undertook several measures designed to increase the Republic's participation in the additional revenues earned from the sale of Ecuadorian oil. Thus, in 2006, the government (under then-President Alfredo Palacio) enacted Law 42, which allowed the Republic to participate in the "extraordinary income" earned by the oil companies (i.e., revenue earned on oil prices above those in effect at the time the Participation Contracts were executed). *Id.* ¶¶ 88-103. In 2008, then-President Rafael Correa announced his government's intention to replace the "Participation Contracts" with "Service Contracts." *Id.* ¶ 123.

Those and related measures led to various disputes between the Parties—including the commencement of the arbitration by Perenco-Ecuador in April 2008. *Id.* ¶ 126. Further efforts to reach a negotiated resolution between the Parties were unsuccessful. *See id.* ¶¶ 127-45. On July 16, 2009, Perenco-Ecuador initiated procedures to suspend its operations at Blocks 7 and 21. *Id.* ¶ 203. The Republic took control of the Blocks on the same day. *Id.* ¶ 204. As discussed below, after taking control of the Blocks, the Republic discovered significant environmental damage, as well as damage to the Blocks' infrastructure, for which the Republic asserted counterclaims against Perenco-Ecuador in the arbitration.

## III.   THE ARBITRATION AND THE AWARD

Perenco-Ecuador submitted its request for arbitration on April 30, 2008, under the ICSID Convention, the Participation Contracts (which contain ICSID arbitration clauses), and the

bilateral investment treaty between Ecuador and France (the "**Ecuador-France BIT**" or the "**BIT**") (which also contains an ICSID arbitration clause).[11]  Perenco-Ecuador claimed the measures taken by the Republic violated several provisions of the Participation Contracts and the BIT.  Perenco-Ecuador also asserted claims against Empresa Estatal Petróleos del Ecuador ("**PetroEcuador**"), the state-owned oil company that had entered the Participation Contracts for both Blocks 7 and 21 on behalf of the Republic.  However, the Arbitral Tribunal dismissed the claims against PetroEcuador at a relatively early stage of the arbitration.  Because Perenco-Ecuador's claims were based on measures allegedly undertaken by the State, the Arbitral Tribunal concluded that Perenco-Ecuador had failed to establish the Tribunal's jurisdiction over PetroEcuador.  2011 Decision on Jurisdiction, ¶¶ 224-31 and 242(3).

As also stated above, the Republic asserted counterclaims, alleging that Perenco-Ecuador had breached its obligations under the Participation Contracts to comply with Ecuador's environmental laws and regulations, resulting in extensive contamination of the soil and groundwater at both Blocks, as well as its obligations to maintain certain infrastructure located in the Blocks, resulting in damage to that infrastructure.  *See* Award, ¶¶ 423-966.

The Arbitral Tribunal held numerous hearings and issued several pre-award decisions before the dispatch of the Award to the Parties on September 27, 2019.  *See* Award, ¶ 52.  The Tribunal accepted certain of Perenco-Ecuador's claims under the Participation Contracts and the BIT, while rejecting others.  The Tribunal ultimately awarded $416,500,000 (consisting largely of lost future profits), plus pre-award interest, for a total of $448,820,400 on Perenco-Ecuador's successful claims.  *Id*. ¶¶ 421-2, 1023(a).  The Tribunal also accepted certain of the Republic's

---

[11] The BIT, officially titled the Agreement between the Government of the Republic of France and the Government of the Republic of Ecuador Concerning the Reciprocal Encouragement and Protection and Investments, is attached as Exhibit E to the Fernandez Johnson Decl.

counterclaims for environmental damage and failure to maintain infrastructure, awarding the Republic $54,439,517 for its counterclaims, plus interest.  *Id.* ¶ 1023(b).[12]  In addition, the Tribunal also ordered each Party to pay a portion of the other's legal fees and costs.  Specifically, the Tribunal ordered the Republic to pay Perenco-Ecuador a total of $23,000,000 in legal fees and costs (plus interest); the Tribunal ordered Perenco-Ecuador to pay the Republic a total of $6,276,153 in legal fees and costs (plus interest).  *Id.* ¶¶ 1022(c) and (d).  The Tribunal also ordered Perenco-Ecuador to pay the legal fees and costs of PetroEcuador in the amount of $49,629.76 (in connection with its successful challenge to jurisdiction), plus interest, to accrue from June 30, 2011 (the date of dispatch of the Tribunal's Decision on Jurisdiction).  *Id.* ¶ 1023(e).[13]

Significantly, Perenco-Ecuador had asked the Arbitral Tribunal to order that "all amounts paid by Ecuador pursuant to the Award be net of any Ecuadorian tax or other fiscal obligations." *See Id.* ¶ 61.  The Arbitral Tribunal declined to grant such relief.  *Id.* ¶ 1021(f).  As discussed below, the subsequent annulment proceedings further reduced the net amounts awarded to Perenco-Ecuador under the Award.

---

[12] The Tribunal found that the environmental damage caused during the period when Perenco-Ecuador was Operator of Blocks 7 and 21 was $93,638,890.  Award, ¶ 899.  However, the Tribunal offset that amount by $39,199,373, which had been separately awarded to the Republic by a different arbitral tribunal in arbitration brought by Burlington (and which Burlington had satisfied in a subsequent settlement).  *Id.* ¶¶ 898-9.  Similarly, the Tribunal found that the damage caused by Perenco-Ecuador's failure to maintain infrastructure was $2,315,969.15, but that amount was offset in its entirety by amounts already paid by Burlington for infrastructure damage.  *Id.* ¶¶ 964-66.

[13] The Petition mistakenly states that the interest on the costs award to PetroEcuador began to accrue on October 1, 2019.  *See* Petition, at 10.  In addition, although the Tribunal authorized pre-award and post-award judgment, Perenco-Ecuador is not entitled to *post-judgment* interest above the rate provided by 28 U.S.C. § 1961(a).

## IV.    THE ANNULMENT PROCEEDINGS AND THE STAY OF THIS ACTION

Under Article 52 of the ICSID Convention, either party may seek annulment of an ICSID award by making an application to the ICSID Secretary-General (the "**Secretary-General**") within 120 days after the date on which the Award was rendered.  The Secretary-General then appoints "an *ad hoc* Committee of three persons" (the "**Annulment Committee**") to decide the annulment application.[14]  The Republic timely filed an annulment application (the "**Annulment Application**") with ICSID on October 2, 2019, in which the Republic also requested a stay of enforcement of the Award pending resolution of the annulment proceedings.  *See* Parties' Joint Stipulation and Order (Dec. 9, 2019) (ECF No. 7) (the "**Joint Stipulation**"), at 1.

The Secretary-General registered the Annulment Application on October 4, 2019, and provisionally stayed enforcement until the Annulment Committee was constituted and able to rule on the Republic's request for a stay of enforcement.  *Id*. at 2.[15]  The Parties' Joint Stipulation provided that the Republic would respond to the Petition on the 61st day after the expiry of the provisional stay or after the expiry of any stay ordered by the Annulment Committee.  *Id*.  This Court construed the Parties' Joint Stipulation as a motion to stay and, on that basis, granted the motion, ordering this case to be stayed "until further Order of the Court."  Minute Order dated December 26, 2019.

---

[14] Unlike the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (also known as the New York Convention), parties to ICSID arbitration do not seek annulment of arbitral awards by a competent authority of the country in which the award was made.  Instead, the ICSID Convention provides its own internal procedure for the resolution of annulment requests.

[15] Under Article 52(5) of the ICSID Convention, if the applicant requests a stay of enforcement in its annulment application, a stay is automatically put in place on a provisional basis, until an annulment committee can address the request for a stay.

The Annulment Committee subsequently granted the Republic's request to continue the stay of execution pending the resolution of the Annulment Application, based on the Republic's commitment "to pay the Award unconditionally, voluntarily and in full, within 60 days after the Committee decides on the Application for Annulment, *if the Application for Annulment were not to be upheld in full or in part*, and attesting that such payment shall not be subject to any enforcement proceedings or to the intervention of Ecuador's courts."  Decision on the Stay of Enforcement of the Award, ¶ 82(a) (emphasis added).[16]  Perenco-Ecuador rests its false accusation that the Republic "defaulted" on the ICSID Award on the commitment given by the Republic to the Annulment Committee; but that commitment was explicitly premised on the Committee's *not granting* the Annulment Application "*in full or in part*."  As set forth below, the Annulment Committee in fact *granted* the Application in part—and, moreover, granted it on an issue relevant to Perenco-Ecuador's income tax liability.  Nor did the Republic make any commitment not to seek setoff for Perenco-Ecuador's unpaid income taxes.  Again, the Arbitral Tribunal rejected Perenco-Ecuador's request that the amounts awarded to it "be net of any Ecuadorian tax or other fiscal obligations."  *See* Award, ¶¶ 61, 1021(f).

The Annulment Committee rendered its Decision on Annulment on May 28, 2021.[17]  The Decision annulled two aspects of the Award concerning the quantum of damages made in favor

---

[16] The Annulment Committee's Decision on the Stay of Enforcement is attached as Exhibit A to the Parties' Joint Status Report (Mar. 25, 2020) (ECF No. 8).  The Annulment Committee subsequently confirmed that it had received the confirmation (provided by the Minister of Economy and Finance in the previous administration of President Correa), which, the Committee said, "complie[d] in form and substance with the requirement of paragraph 82(a) of the Decision on the Stay," and that the Annulment Committee's stay of enforcement therefore remained in place.  Procedural Order No. 2, ¶¶ 5-6 (Apr. 21, 2020) (attached as Exhibit A to the Parties' Joint Status Report (June 23, 2020) (ECF No. 11)).

[17] The Decision on Annulment is attached as Exhibit A to the Parties' Joint Status Report (June 21, 2021) (ECF No. 15).

of Perenco-Ecuador.  *First*, the Decision annulled the Arbitral Tribunal's decision to award

$25,000,000 to Perenco-Ecuador "to compensate its loss of opportunity on the extension of its

operation of Block 7."  *Id.* ¶¶ 429, 470.  The Committee concluded that the Award "failed to

state reasons to conclude that [such] loss of profit should be awarded and the amount therefor,"

and that, accordingly, the amount of $25,000,000 must be annulled and deducted from the

$416,500,000 awarded to Perenco-Ecuador for its claims (not including interest and costs).  *Id.*

¶¶ 469-70.

      *Second*, the Republic had argued to the Arbitral Tribunal that under Ecuadorian law,

Perenco-Ecuador improperly deducted from its income taxes certain costs for transporting oil

through the OCP Pipeline (the "**OCP ship-or-pay costs**")—which inflated Perenco-Ecuador's

net-present-value calculation by $9,000,000.  *Id.* ¶ 564.[18]  The Tribunal nonetheless included the

$9,000,000 amount in its calculation of Perenco-Ecuador's damages, effectively adopting

Perenco-Ecuador's argument that the OCP ship-or-pay costs were tax deductible.  *Id.* ¶¶ 564,

574.  The Annulment Committee agreed with the Republic that the Arbitral Tribunal had reached

the conclusion that the OCP ship-or-pay costs were fully tax-deductible without stating its

reasons for that conclusion.  Accordingly, the Committee ruled that $9,000,000 must also be

deducted from the $416,500,000 million awarded to Perenco-Ecuador for its claims.

*Id.* ¶¶ 572-4.

      The Parties are agreed that the Award amount in favor of Perenco-Ecuador following

partial annulment—and net of the amounts owed to the Republic for its successful counterclaims

---

[18] Specifically, the Republic explained that under Ecuadorian law, "only the portion of the shipping costs corresponding to amounts actually transported through the OCP pipeline was tax deductible."  Award, ¶ 564.  Perenco-Ecuador's improper tax deduction for the OCP ship-or-pay costs meant that Perenco-Ecuador overestimated its future cash flows in calculating its net present value.  *Id.*

and for the portion of fees and costs awarded to the Republic and PetroEcuador by the Tribunal—is $391,392,984 (not including post-Award interest).  *See* Supplemental Joint Status Report (July 27, 2021) (ECF No. 17), at 2.  For the reasons stated herein, the Court should offset the Award amount by the amount of Perenco-Ecuador's unpaid income taxes owed to the Republic, as finally adjudicated in the courts of Ecuador.

## V.     THE TAX DEBT FOR WHICH THE REPUBLIC SEEKS SETOFF

As stated above, Perenco-Ecuador was responsible as Operator for filing the income tax returns and paying the income taxes of the Contractor (i.e., Perenco-Ecuador, Burlington, and Preussag) for the period 2002-2005.  Perenco-Ecuador was then responsible as Operator for filing the income tax returns and paying the income taxes of the Consortium for 2006-2009.  *See* Ordóñez Decl., ¶¶ 16-18.

As explained more fully below, for purposes of the Republic's Opposition and Cross-Motion, Perenco-Ecuador's income tax liability falls into two distinct categories:  (1) the income tax claims that have now been affirmed by Ecuador's **National Court of Justice** ("*Corte Nacional de Justicia*" (formerly known as the Supreme Court)— which claims, under Ecuadorian law, are final and enforceable against Perenco-Ecuador; and (2) the income tax claims that remain pending either before the National Court of Justice or in the lower District Court for Tax Disputes (the "**District Tax Court**") ("*Tribunal Distrital de lo Contencioso Tributario*")—which claims, under Ecuadorian law, cannot be enforced until the relevant court has ruled (and, as regards proceedings before the National Court of Justice, unless Perenco-Ecuador has failed to pay the guarantee required under Ecuadorian law).  *See* Coronel Report, ¶ 22, 25.  Consistent with Ecuadorian law, the Republic presently seeks setoff only for those tax claims that have been affirmed by the National Court of Justice (or which are pending before that Court, but for which Perenco-Ecuador failed to pay the security required to stay enforcement).

However, the Republic reserves it rights to amend its request for setoff for any pending tax claims that become final and enforceable under Ecuadorian law and asks the Court to stay enforcement against the amount of the pending tax claims for that purpose.

Before turning to the two categories of Perenco-Ecuador's income tax liability, it is important to summarize the legal framework for the determination and collection of taxes in Ecuador.

### A.     Ecuador's Legal Framework for Income Tax Determination and Collection

The determination and collection of income tax in Ecuador is governed by the Internal Tax Regime Law (*Ley de Régimen Tributario Interno*) (the "**LRTI**").  Article 4 of the LRTI provides that "companies, national or foreign, domiciled in the country or not, which obtain taxable income," are subject to income tax.  Income taxes are paid either by the taxpayer or by the representative of the taxpayer.  Coronel Report, ¶¶ 33-35; Ordóñez Decl., ¶ 19.  The representative of the taxpayer is the natural or legal person who is legally bound to comply with the taxpayer's tax obligations.  Ordóñez Decl., ¶¶ 22-23; Coronel Report, ¶ 34.  The taxpayer and the taxpayer's representative are jointly and severally liable for the taxpayer's tax obligations.  Ordóñez Decl., ¶ 22; Coronel Report, ¶ 34.  As Operator for the Contractor and then the Consortium, Perenco-Ecuador was also the legal representative for both entities, and responsible for filing their tax returns and paying their taxes.  Ordóñez Decl., ¶¶ 16-17, 23; Coronel Report, ¶ 44.  As such, Perenco-Ecuador is jointly and severally liable for the tax liability of both the Contractor and Consortium.  Ordóñez Decl., ¶¶ 18, 22-24; Coronel Report, ¶ 44.

In Ecuador, the Internal Revenue Service (*Servicio de Rentas Internas*) (the "**SRI**") is responsible for determining, auditing, and collecting taxes.  Coronel Report, ¶ 20; Ordóñez Decl., ¶ 12.  The SRI discovered Perenco-Ecuador's tax underpayments in audits carried out at various times between 2006 and 2012.  *See* Ordóñez Decl., ¶ 25.  Once the SRI completes an

audit and finds an underpayment, it then issues a **Bill of Assessment** ("*Acta de Determinación*")
to the taxpayer or its representative.  Under Ecuadorian law, a taxpayer or its representative is
afforded a robust process of review to challenge a Bill of Assessment (of which Perenco-Ecuador
has availed itself, as discussed below).

Thus, the taxpayer or its representative may challenge the Bill of Assessment to the SRI,
or it can challenge the Notice directly before the District Tax Court.  The District Tax Court is
part of Ecuador's judicial branch and, as such, is independent from the SRI.  Coronel Report,
¶ 21(ii).  If a challenge to the SRI is made, the SRI has 120 days to issue a reasoned **Resolution**
("*Resolución Motivada*"), which may accept or reject the challenge in whole or in part.  Coronel
Report, ¶ 21(i).  After the SRI issues a Resolution, the taxpayer or its representative can then
challenge the Resolution in the District Tax Court.  After the District Tax Court has ruled, the
losing party may bring a "cassation" appeal, solely on points of law, to the National Court of
Justice.  Coronel Report, ¶¶ 21(ii), 24.[19]

As explained by Professor Coronel, under Ecuadorian law, Perenco-Ecuador's income
tax liabilities for 2002 (Block 7), 2004 (Blocks 7 and 21), 2005 (Blocks 7 and 21), and 2006
(Block 21) are now final and enforceable, because Perenco-Ecuador has appealed them to the
National Court of Justice and lost—or, in the case of the 2002 tax liability, because Perenco-
Ecuador failed to provide security for its pending appeal before the National Court of Justice.
Coronel Report, ¶ 40.  Claims made by the SRI for subsequent tax years (and for Block 7 for the

---

[19] In a cassation appeal, the National Court of Justice reviews legal issues but does not revisit the
lower court's determinations of fact.  *Id*. ¶ 24.  The losing party in the National Court of Justice
may file an extraordinary constitutional protection action before the Ecuador's Constitutional
Court (which Perenco-Ecuador has done for each case it lost in the National Court of Justice).
However, once the National Court of Justice has ruled, the tax assessment is enforceable.
Recourse to the Constitutional Court does not provide a further stay of enforceability.  *Id*.

fiscal year 2006) are still pending before either the District Tax Court or the National Court of Justice.  As such, they are not yet enforceable under Ecuadorian law.  *Id*. ¶ 45.  As set forth in Section V(C), the Republic asks the Court to stay enforcement against the amount of the pending tax claims, so that if any are resolved in the Republic's favor in Ecuador, the Republic can seek further offset against the Award.

### B.     The Income Tax Claims Affirmed by the National Court of Justice

As stated above, the National Court of Justice has now affirmed the SRI's tax claims against Perenco-Ecuador for the tax years 2004, 2005, and for Block 21 in 2006.  Therefore, those claims are now final and enforceable against Perenco-Ecuador.  In addition, because Perenco-Ecuador failed to provide security for its pending appeal before the National Court of Justice, the SRI's tax claim for 2002 (Block 7) (which was affirmed by the District Tax Court) is also final and enforceable against Perenco-Ecuador.  Coronel Report, ¶ 40.

Again, as Operator, Perenco-Ecuador was legally obligated to file the tax returns and to pay the taxes for the Contractor for the period 2002-2005; and to do so for the Consortium for 2006 and subsequent years.  Ordóñez Decl., ¶¶ 16-17, 23; Coronel Report, ¶ 34.  However, Perenco-Ecuador failed to file any tax returns for the Contractor in the period 2002-2005.  Instead, Perenco-Ecuador, Burlington and Preussag filed individual tax returns.  The SRI's audits of those tax years found that in so doing, they significantly underpaid the income taxes owed by the Contractor to the Republic for 2002, 2004, and 2005.  Ordóñez Decl., ¶ 25.  In addition, the SRI found multiple other errors resulting in underpayment of income taxes, including excessive deductions for OCP ship-or-pay costs and various other items.  *Id*.

The SRI conducted its audits for the 2002-2006 period at various times in 2006, 2009, 2010, and 2011, issuing its Bills of Assessment on November 29, 2006 (for the 2002 tax year), on July 29, 2011 (for the 2004 and 2005 tax years), and September 22, 2010 (for the 2006 tax

year).  *Id.* ¶ 25.  Perenco-Ecuador challenged each Bill of Assessment to the SRI (except for the

Bill of Assessment for the 2002 tax year, which it appealed directly to the District Tax Court).

The SRI issued Resolutions rejecting the challenges for 2004 and 2005, and partially accepting

the challenge for 2006 (thereby reducing the amount of the tax underpayment originally

assessed).  In decisions rendered between August 29, 2016, and December 19, 2017, the District

Tax Court rejected most of Perenco-Ecuador's challenges to the SRI Resolutions.  *Id.* ¶¶ 26(a),

30(a)-(c), 33.  Perenco-Ecuador then appealed the District Tax Court's decisions to the National

Court of Justice, which rejected all of them (except with respect to the appeal of the decision

concerning the 2002 tax year (Block 7), which as of the date of this Memorandum remains

pending in that Court).  *Id.*  With respect to tax years 2004, 2005, and 2006 (Block 21), the

National Court of Justice rejected Perenco-Ecuador's appeals on the basis that Perenco-Ecuador

made the appeal on its own behalf, when it should have appealed on behalf of the Contractor,

and that it therefore lacked standing to bring the appeal solely in its individual capacity.  *Id.*

¶ 33(b)-(c).

Because the National Court of Justice has now dismissed Perenco-Ecuador's appeals for

tax years 2004, 2005, and part of 2006 (Block 21)—and because Perenco-Ecuador failed to post

security for its appeal to the National Court for tax year 2002 (Block 7)—the following

assessments for unpaid income taxes are now final and enforceable under Ecuadorian law:

| Year | Block | Principal (in USD) | Interest as of 9 August 2021 (in USD) | Total (in USD) |
|---|---|---|---|---|
| 2002 | 7 | 523.994,02 | 1.153.332,36 | 1.677.326,38 |
| 2004 | 21 | 3.354.529,62 | 6.239.325,65 | 9.593.855,27 |
| | 7 | 705.817,54 | 864.141,23 | 1.569.958,77 |
| 2005 | 21 | 4.524.950,19 | 8.468.267,74 | 12.993.217,93 |

| | 7 | 3.806.765,95 | 6.766.149,18 | 10.572.915,13 |
| 2006 | 21 | 2.242.472,13 | 3.705.283,61 | 5.947.755,74 |
| **Total (in USD)** | | **15.158.529,45** | **27.196.499,77** | **42.355.029,22**[20] |

*See* Coronel Report, ¶ 40, Table 4.[21]

However, as stated by Mr. Ordóñez, although Perenco-Ecuador's liability for the Contractor Taxes is final and enforceable against Perenco-Ecuador under Ecuadorian law, the SRI has not been able to enforce those tax liabilities against Perenco-Ecuador due to its insolvency.  Ordóñez Decl., ¶¶ 42-45.  The Republic therefore asks this Court to setoff these final and enforceable tax liabilities against the Award amounts due to Perenco-Ecuador in this action, less the amount of the securities that Perenco-Ecuador paid for certain of its cassation appeals to the National Court of Justice and in the enforcement (*coactiva*) proceedings (*see* Ordóñez Decl. at 31).  After taking that amount into account, the sum of the final and enforceable tax liability for which the Republic seeks offset is $40,845,760.13.  As explained by Mr. Ordóñez (and as indicated above), a significant amount of that liability is comprised of

[20] To date, the SRI has collected a total of $1,509,269.09 on account of the guarantees that Perenco-Ecuador posted in (i) the proceedings before the National Court of Justice where it challenged the District Tax Court's decision to uphold the SRI's tax determinations for the fiscal years 2004 and 2005 ($1,240,127.44), and (ii) local enforcement proceedings against Perenco-Ecuador for the fiscal year 2006 ($269,141.65).  Ordóñez Decl. at 31.  Accordingly, the total amount collected by the SRI is being subtracted (i.e., offset) from the total amount of Perenco-Ecuador's enforceable tax obligations—to reach a figure of $40,845,760.13.

[21] As reported by both Mr. Ordóñez and Prof. Coronel, following the National Court of Justice's rulings with respect to tax years 2004, 2005, and 2006 (Block 21), Perenco-Ecuador commenced extraordinary protection actions before Ecuador's Constitutional Court.  Ordóñez Decl., ¶ 33; Coronel Report, ¶ 28.  But again, under Ecuadorian law, the tax obligations are deemed final and enforceable once the National Court of Justice has ruled; they are not stayed pending an appeal to the Constitutional Court.  Coronel Report, ¶ 27.  Moreover, the Constitutional Court has now rejected Perenco-Ecuador's extraordinary protection actions for the tax years 2004, 2005, and 2006 (Block 21).  Ordóñez Decl., ¶ 33; Coronel Report, ¶ 28.

interest, which continues to accrue.  *Id*. ¶¶ 38-40.  Accordingly, the Republic reserves its right to update the amount of the setoff closer to the date of the Court's anticipated judgment to account for additional accrued interest.

### C.     The Pending Income Tax Claims

Because the Republic does not presently seek setoff for the tax claims that remain pending before either the District Tax Court or the National Court of Justice, we will only briefly describe the status of those claims.  As stated, however, the Republic asks the Court to stay enforcement with respect to the amount of the liability for the pending income tax claims.

As Operator and legal representative of the Consortium, Perenco-Ecuador filed tax returns and paid income taxes on the Consortium's behalf for the period 2006-2009.  Ordóñez Decl., ¶¶ 16-17, 23.  However, in audits carried out between 2010 and 2012, the SRI found underpayments in the returns, and therefore issued Bills of Assessment to Perenco-Ecuador.  *Id.* ¶ 25.  Perenco-Ecuador challenged the Bills of Assessment before the SRI, which issued Resolutions on each challenge (some of which reduced the amount of the underpayments initially found by the SRI).  Perenco-Ecuador challenged the Resolutions to the District Tax Court—which accepted several of Perenco-Ecuador's challenges (specifically, for tax year 2007 with respect to Block 7, and for tax year 2009 with respect to Block 21).  The SRI has now appealed the District Tax Court's adverse rulings on those challenges to the National Court of Justice.  Perenco-Ecuador's challenges to the SRI Resolutions for tax year 2007 (Block 21) and tax year 2008 remain pending in the District Tax Court.  The District Tax Court rejected Perenco-Ecuador's other challenges to the SRI Resolutions, and Perenco-Ecuador has appealed those rulings to the National Court of Justice.  *Id.* ¶ 33.  The value of the tax claims pending in the District Tax Court and National Court of Justice currently amount to $ 30,671,645.44 (including interest).  Ordóñez Decl., at 31-32.

Again, the commencement by a taxpayer or its representative of a cassation appeal (and the payment of a security in connection with that appeal) stays the enforcement of the tax liability.  Therefore, the Republic is not presently seeking setoff for such obligations.  However, if the National Court of Justice concludes that any of the liabilities for Perenco-Ecuador's Consortium Taxes should be upheld, the Republic reserves its right to seek setoff for such liabilities in this action.  The Republic therefore asks the Court to stay enforcement against the amounts of the pending income tax claims, so that the Republic can seek offset for them if they are resolved in the Republic's favor.

## ARGUMENT

### I.   THE COURT SHOULD APPLY THE RIGHT OF SETOFF IN THIS CASE

Courts in the United States, including the Supreme Court, have long recognized the right of setoff.  As the Supreme Court explained in *Citizens Bank of Maryland v. Strumpf*:

> The right of setoff (also called "offset") allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A."

516 U.S. 16, 18 (1995) (quoting *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528 (1913)).  *See also York v. United States*, 909 F. Supp. 4, 7-8 (D.D.C. 1995) ("[O]ffset or setoff refers to a procedural device by which a party may seek to reduce the amount owed to an opponent party by the value of the opponent's cross-obligations to that party."); *Nashville Lodging Co. v. Resolution Trust Corp.*, 59 F. 3d 236, 246 (D.C. Cir. 1995) (setoff is a "procedural device[] by which a defendant seeks to reduce the amount he owes to a plaintiff by the value of the plaintiff's cross-obligations to the defendant.").

As the Supreme Court has also recognized, the right of setoff belongs "to *every* creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts

due to him.'"  *United States v. Munsey Trust Co*, 332 U.S. 234, 239 (1947) (emphasis added)

(quoting *Gratiot v. United States*, 40 U.S. (15 Pet.) 336, 370 (1841) (other citation omitted).

Every creditor includes the U.S. government (as the Court held in *Munsey*) and includes foreign

governments as well.  *See, e.g., Micula*, 404 F. Supp. 3d at 284 (granting a foreign State setoffs

against an ICSID award), *aff'd*, 805 F. App'x 1 (D.C. Cir. May 19, 2020); *Thai Lao Lignite*

*(Thailand) Co., Ltd. v. Gov't of the Lao People's Democratic Republic*, No. 10-CV-5256

(KMW) (DCF), 2016 WL 958640, at *4 (S.D.N.Y. Mar. 8, 2016) (allowing a foreign State to

offset discovery sanctions with foreign judgments, even though such judgments were not yet

enforceable in the United States); *Compagnie Noga D'Importation et D'Exportation S.A. v.*

*Russian Federation*, No. 00 Civ. 0632(WHP), 2008 WL 3833257, at *7 (S.D.N.Y. Aug. 15,

2008) (incorporating by reference a previous order granting the foreign State's request to apply a

set-off against the Swedish judgments domesticated by the petitioner), *aff'd*, 2009 WL 3017385,

at *2 (2d Cir. Sep. 22, 2009).

Similarly, federal courts (including the Supreme Court) have allowed setoffs to be made

against foreign state-owned enterprises against obligations that the States or state-owned

enterprises sought to enforce in the United States.  *See*, *e.g.*, *First Nat'l City Bank v. Banco Para*

*El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (holding that in an action by a Cuban state-

owned bank to enforce a letter of credit against an American bank, the American bank could

offset the letter of credit with amounts owed to it by the Cuban government); *Banco Central de*

*Reserva del Peru v. Riggs Nat'l Bank of Washington, D.C.*, 919 F. Supp. 13 (D.D.C. 1994)

(holding that an American bank could offset a Peruvian state-owned bank's claim to recover a $2

million deposit with a $6 million loan debt owed by other Peruvian state-owned banks to

American bank).

The right of setoff in American courts arises from the court's inherent equitable powers. As this Court recognized in *York*, "[t]he right of a court to set off one debt or obligation against another is a 'principle of long standing in all systems of jurisprudence' and is grounded in the equity power of the court.'" 909 F. Supp. at 8 (quoting *Blount v. Windley*, 95 U.S. 173, 176-77 (1877) and citing 47 Am. Jur. 2d *Judgments* §§ 1029-32 (1995)).

In this case, the equitable factors weigh overwhelmingly in favor of setoff. As stated above, Perenco-Ecuador is insolvent. The Republic is therefore unable to collect (or otherwise enforce) Perenco-Ecuador's unpaid tax liability in Ecuador. Nor, to the Republic's knowledge, does Perenco-Ecuador have assets elsewhere. As both the Supreme Court and the Court of Appeals for the District of Columbia Circuit have recognized, "the insolvency of the party against whom the set-off is claimed is a sufficient ground" for the application of setoff. *Brownley v. Peyser*, 98 F. 2d 337, 340 (D.C. Cir. 1938) (quoting *N. Chicago Rolling-Mill Co. v. St. Louis Ore & Steel Co.*, 152 U.S. 596, 615 (1894)). *See also In re Columbia Hosp. for Women Med. Ctr., Inc.*, 461 B.R. 648, 671 (Bankr. D.D.C. 2011) (same). Indeed, setoff in this action may be the only opportunity for the Republic to recover the tax liability that Perenco-Ecuador incurred but failed to pay in Ecuador.

There is no requirement that the Republic's setoff claim arise from the same transaction that the Republic seeks to enforce in its Petition. *See Nashville Lodging*, 59 F.3d at 246 ("setoff refers to the balancing of obligations that the parties incurred in wholly separate transactions."). Here, however, Perenco-Ecuador's income tax liability arose out of the same transaction as the ICSID arbitration, i.e., Perenco-Ecuador's interest in (and profits from) the exploitation of oil in Blocks 7 and 21. It is fair and appropriate that the Award amounts in favor of Perenco-Ecuador be offset by the tax debt owed by Perenco-Ecuador for its exploitation of the same Blocks. (And

23

again, the Arbitral Tribunal rejected Perenco-Ecuador's specific request that "all amounts paid by Ecuador . . . be net of any Ecuadorian tax or other fiscal obligations."  Award, ¶¶ 61, 1021(f)).

Finally, the requirement of mutuality between the creditor and debtor is satisfied here. *See, e.g., Banco Central*, 919 F. Supp. at 16 (debts are mutual, and therefore appropriate for setoff, when they are due and from the same person) (citing *Martens v. Hadley Mem'l Hosp.*, 729 F. Supp. 1391, 1396 (D.D.C. 1990)).  As explained by both Prof. Coronel and Mr. Ordóñez, under Ecuadorian law, Perenco-Ecuador is the entity responsible for the income tax liability at issue here.  Coronel Report, ¶ 43; Ordóñez Decl., ¶¶ 13, 16-19.  With respect to the tax liability that has been affirmed by the National Court of Justice, there is no question that such liability is due from and enforceable against Perenco-Ecuador.  Coronel Report, ¶¶ 40, 43.  Indeed, the Republic would have enforced that liability, but for Perenco-Ecuador's insolvency in Ecuador. Therefore, these debts—owed by Perenco-Ecuador to the Republic—are appropriately offset against the Award amount that Perenco-Ecuador seeks to enforce in this action.

For these reasons, the Court should offset the Award amount in favor of Perenco-Ecuador with the amount of Perenco-Ecuador's income tax liability owed to the Republic that has been fully adjudicated in Ecuador.

## II.   THE COURT SHOULD OFFSET PETITIONER'S TAX LIABILITY AGAINST THE ICSID AWARD CONSISTENT WITH THE *MICULA* DECISION

As this Court held in *Micula*, where, as here, a petitioner seeks enforcement of an award rendered under the ICSID Convention, the respondent State may offset the amount of the award with liability owed by the petitioner to the State.  404 F. Supp. 3d at 284.

Article 54 of the ICSID Convention provides that "[e]ach Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in

that State."  However, the ICSID Convention is not self-executing, *Micula*, 404 F. Supp. 3d at

269, and is therefore implemented by statute.  According to 22 U.S.C. § 1650a, the implementing

statute for the ICSID Convention, a court shall enforce "[t]he pecuniary obligations imposed by"

an ICSID Convention award as if those obligations were imposed by a judgment of a sister state

entitled to full faith and credit.  22 U.S.C. § 1650a(a).

As distinct from the implementing statute for the New York Convention, which applies to

many international commercial arbitration awards, Section 1650a does not use the term

"recognition" in conjunction with "enforcement."  The import of that distinction is that courts

need not take the intermediate step of reducing the full amount of an ICSID Convention award to

judgment prior to considering setoffs against the award. As explained by the Second Circuit in

*Mobil Cerro Negro*:

> In contrast to the Convention, Section 1650a(a) refers to enforcement,
> but not to recognition: it directs only that "[t]he pecuniary obligations
> imposed by such an award shall be enforced and shall be given the
> same full faith and credit as if the award were a final judgment of a
> court of general jurisdiction of one of the several States."  It makes no
> mention of recognition as a separate, additional judicial action, and we
> think that its framing was intentional.

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96, 119-20 (2d Cir.

2017) (citations omitted).  Accordingly, Section 1650a permits parties in ICSID award

enforcement actions "to make non-merits challenges to the award," including "the possibility

that an offset might apply to the award that would make execution in the full amount improper."

*Id.* at 121.

In *Micula*, this Court granted Romania's defense of setoff against the pecuniary

obligations imposed by an ICSID Convention award.  There, Romania claimed that it had

satisfied the award in full and asked the Court to dismiss the petition.  Romania claimed that it

had satisfied the award in three main ways.  *First*, after obtaining the favorable award against

Romania, the petitioners had commenced enforcement actions in various jurisdictions.  Through those actions, the petitioners had seized approximately $11 million in assets belonging to Romania.  *Micula*, 404 F. Supp. 3d at 284.  *Second*, the petitioners owed approximately EUR 76 million in outstanding tax debts toward the government of Romania.  *Id*.  *Third*, the Romanian Ministry of Public Finance had deposited approximately EUR 106.5 million "into a specially created, legislatively authorized Treasury account in Petitioners' names to satisfy the Award." *Id.* However, the petitioners "never had access" to that account, and "Romania subsequently withdrew the funds" that it had deposited.  *Id.*  Romania claimed that by virtue of (i) the petitioners' asset seizures, (ii) the petitioners' tax debts, and (iii) Romania's transfer of funds into the Treasury account, Romania had satisfied the award in full.

The Court in *Micula* held that "the defense of setoff or satisfaction is available" in proceedings to enforce an ICSID Convention award.[22]  *Id.* at 283.  It accepted Romania's setoff defense with regard to the asset seizures, observing that "Petitioners do not dispute that they have received some money from Romania through these forced executions and that such sums are appropriately offset against the Award."  *Id.* at 284.  The Court held that that amount was properly reduced from the final judgment.  *Id.*

Although the Court did not grant setoff of the petitioner's tax obligations against the amount of the award, the sole reason for that conclusion was that the tax judgments in question

---

[22] Petitioners argued that setoff was not available in the context of an ICSID Convention award enforcement action. This Court rejected that argument. "Petitioners insist that 'Romania's contention that it has "satisfied" the Award is no defense to the confirmation of a binding, final ICSID Award.'  That assertion is wrong. It rests on the mistaken understanding that, under § 1650a, there is a 'confirmation' proceeding that is separate and distinct from an enforcement proceeding. There is not. Section 1650a speaks only of 'enforcement' of an ICSID award. In such a proceeding, the defense of setoff or satisfaction is available."  *Micula*, 404 F. Supp. 3d at 283 (citations omitted).

had been annulled by a Romanian court. *Id.* at 284 ("With the claimed tax setoffs at present

annulled, Romania cannot rely on them to satisfy the Award.")[23]   As such, the tax judgments no

longer represented a valid liability of the petitioners toward Romania.

Finally, the Court rejected Romania's claim that the funds it transferred into a special

account, and subsequently withdrew, had satisfied part of the award.  Having accepted

Romania's setoff defense in part, the Court held that "judgment shall be entered in favor of

Petitioners and against Romania in the amount of $331,557,687, which reflects the sum total of

the Award net payments made by Romania[.]"  *Id.* at 285 (citations omitted).

In sum, under *Micula*, the Court should set off an ICSID Convention award-creditor's

obligations toward the respondent state, so long as those obligations have not been annulled.  As

such, an enforcing court's judgment on the award should be entered in the net amount of the

award's pecuniary value minus the creditors' obligations toward the respondent state.  Consistent

with *Micula*, this Court should offset the Award amount in favor of Perenco-Ecuador with the

amount of Perenco-Ecuador's outstanding income tax liability that has been finally adjudicated

in Ecuador.

In addition, the Court should stay enforcement against the pending tax claims, so that the

Republic can seek to offset those claims if they are resolved in the Republic's favor in Ecuador.

District courts "ha[ve] broad discretion" in deciding whether to stay proceedings "pending the

resolution of independent proceedings elsewhere."  *Marsh v. Johnson*, 263 F. Supp. 2d 49, 52

(D.D.C. 2003) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)); *accord 9REN Holding*

*S.A.R.L. v. Kingdom of Spain*, No. 19-cv-01871 (TSC), 2020 WL 5816012, at *2 (D.D.C. Sept.

---

[23] The Court "assumed" that the setoff issue was governed by Romanian law and the parties
apparently did not argue otherwise.  *Micula*, 404 F. Supp. 3d at 284.

30, 2020).  In exercising that discretion, courts must "'weigh competing interests and maintain an even balance' between the court's interests in judicial economy and any possible hardship to the parties[.]"  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732-33 (D.C. Cir. 2012) (quoting *Landis*, 299 U.S. at 254-55, 259).  Here, too, this action likely presents the only opportunity for the Republic to satisfy Perenco-Ecuador's income tax liability.  Therefore, offsetting the Award amounts with the liability from the pending debt (if affirmed by the National Court of Justice) outweighs any potential hardship to Perenco-Ecuador.

## III.   PERENCO-ECUADOR IS NOT ENTITLED TO POST-JUDGMENT INTEREST BEYOND THE RATE PROVIDED PURSUANT TO 28 U.S.C. § 1961(A)

The Tribunal ordered that "post-award" interest on the cost portions of the Award should accrue "with simple interest at an annual rate of three percent" (Award, ¶¶ 1023(c), (d), and (e)) and that interests on the remaining (i.e., the liability) portions should accrue "at a rate of LIBOR for three-month borrowing plus two percent, compounded annually."  *Id.* ¶¶ 1023(a) and (b). The Tribunal further ordered that interest shall accrue from September 27, 2019 "until the date of full and final payment" (*id.* ¶¶ 1023(a), (b), (c), and (d))—except for the costs award for PetroEcuador, "which shall accrue from 30 June 2011 (the date of dispatch of the Tribunal's Decision on Jurisdiction) . . . ."  *Id.* ¶ 1023(e).  Petitioner repeats the language—"until full and final payment"—in the Prayer for Relief concerning the calculation of interest.  *See* Petition, Prayer for Relief, (b)(iii), at 10.

This Court has held that post-judgment interest on ICSID awards is set at the statutory rate provided in 28 U.S.C. § 1961(a).  "A different post-judgment interest rate can only be applied in two instances: (1) when the parties agree to a different rate by 'clear, unambiguous, and unequivocal language,' or (2) when the arbitral award itself 'explicitly state[s] the interest rate to be applied 'post judgment.'"  *Tenaris, S.A. v. Bolivarian Republic of Venezuela*, No. 1:18-

cv-01373 (CJN), 2021 WL 1177996, at *2 (D.D.C. Mar. 29, 2021) (quoting *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004) and *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 16-01533 (ABJ), 2019 WL 2185040, at *6, (D.D.C. May 21, 2019)). In *OI European*, this Court agreed with numerous other courts that "where an award specifies an interest rate 'until payment,' that language does not clearly portray the intent of the parties to replace the federal interest rate. Rather, the award must explicitly state the interest rate to be applied 'post-judgment.'" 2019 WL 2185040, at *6 (citing *Bayer CropScience AG v. Dow Agrosciences, LLC*, 680 F. App'x 985, 1001 (Fed. Cir. 2017); *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F. 3d 448, 456–60 (5th Cir. 2013); *In re Riebesell*, 586 F. 3d 782, 794–95 (10th Cir. 2009); *D'Urso*, 371 F. 3d at 102).

Therefore, any post-judgment interest ordered by this Court must be at the rate provided for by 28 U.S.C. § 1961(a). Furthermore, for the avoidance of doubt, the pre-award and post-award interest on the costs in favor of PetroEcuador accrues from June 30, 2011 (as stated in the Award), not from October 1, 2019 (as asserted in the Petition).

## CONCLUSION

For the foregoing reasons, the Court should offset the Award amount in favor of Perenco-Ecuador with the amount of Perenco-Ecuador's outstanding income tax liability that has been fully adjudicated in Ecuador, i.e., $40,845,760.13. In addition, the Court should stay enforcement against the pending tax claims in the amount of $30,671,345.44, until those claims are fully adjudicated. The Court should grant all further relief requested in the Republic's Partial Opposition and Cross-Motion.

Dated:  August 9, 2021                    Respectfully submitted,

                                          */s/ Alexandre de Gramont*
                                          Alexandre de Gramont
                                          D.C. Bar No. 430640
                                          DECHERT LLP
                                          1900 K Street NW
                                          Washington, DC 20006
                                          Tel: (202) 261-3300
                                          Fax: (202) 261-3333
                                          alexandre.degramont@dechert.com

                                          Michael A. Losco*
                                          N.Y. Bar No. 5356505
                                          Tamar Sarjveladze*
                                          N.Y. Bar No. 5703608
                                          DECHERT LLP
                                          1095 Avenue of the Americas
                                          New York, NY 10036
                                          Tel.: (212) 641-5645
                                          michael.losco@dechert.com
                                          tamar.sarjveladze@dechert.com
                                          **Pro hac vice* pending

                                          *Counsel for the Respondent*