## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PERENCO ECUADOR LTD, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 1:19-cv-02943-KBJ |
| v. | ) | |
| | ) | ORAL ARGUMENT REQUESTED |
| THE REPUBLIC OF ECUADOR, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## PERENCO'S CONSOLIDATED RESPONSE TO THE REPUBLIC OF ECUADOR'S PARTIAL OPPOSITION TO PETITION TO ENFORCE ARBITRAL AWARD AND CROSS-MOTION FOR SETOFF

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 5

    A.    Perenco and Ecuador's Underlying Dispute ............................................. 5

    B.    The ICSID Award in Favor of Perenco ................................................... 8

    C.    Perenco Seeks Enforcement of the Award in this Court........................... 9

    D.    Ecuador Seeks to Annul the Award and Guarantees Payment in Exchange for the Committee's Stay of Enforcement .............................................. 9

    E.    The Committee Upholds the Award Almost Entirely............................... 11

    F.    Ecuador Reneges on Its Payment Undertaking and Perenco Resumes Enforcement Proceedings in this Court ................................................... 12

ARGUMENT ........................................................................................................... 14

I.    Perenco Has Indisputably Satisfied the Requirements for Enforcing the Award Under the U.S. Implementing Legislation for the ICSID Convention ............ 14

II.    Section 1650a Forecloses Ecuador's Set-Off Defense ................................... 16

    A.    Section 1650a Prohibits Set-Offs Against ICSID Awards ...................... 17

    B.    *Mobil* and *Micula* Do Not Compel a Contrary Conclusion ................... 20

III.    Ecuador Is Judicially Estopped from Asserting and Has Waived Any Objection to Enforcement of the Award............................................................................ 22

    A.    Judicial Estoppel .................................................................................... 23

    B.    Waiver.................................................................................................... 28

IV.    The Revenue Rule Bars Ecuador's Tax Claim Set-Off ................................... 30

V.    Ecuador Cannot Satisfy Even the Basic Requirements for Enforcing Foreign Judgments in U.S. Courts or for an Equitable Set-Off ................................... 32

    A.    The Ecuadorian Tax Judgments Are Not Entitled to Recognition in a U.S. Court ..................................................................................................... 32

        1. The Ecuadorian Tax Judgments Are Not Enforceable as a Matter of International Comity ............................................................................ 33

        2. D.C. Law Prohibits Enforcing the Ecuadorian Tax Judgments ........................ 37

B.      Even if Ecuador Had Valid Claims for Enforcement of Ecuadorian Tax Judgments, They Could Not Be Set Off Against the Award ................................ 38

VI.    A Stay of Enforcement Pending the Ecuadorian Tax Proceedings Is Not Warranted ................................................................................................................ 41

VII.   Perenco Is Entitled to Post-Award Interest at the Rate Awarded by the Tribunal ........... 43

CONCLUSION ................................................................................................................ 45

## **TABLE OF AUTHORITIES**

CASES

*9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 19-CV-01871 (TSC), 2020 WL
5816012 (D.D.C. Sept. 30, 2020) ..................................................................41

*Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings*, 268 F.3d 103 (2d Cir. 2001) ............30

*Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144 (D.D.C. 2018)..........................17

*\*BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233 (D.D.C. 2015), *aff'd*, 650 F.
App'x 17 (D.C. Cir. 2016) ....................................................................................3, 30

*\*Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724 (D.C. Cir. 2012)..............................41, 42

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58 (2d Cir. 2017) ......................22

*\*Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362 (S.D.N.Y. 2014), *aff'd*, 833 F.3d 74
(2d Cir. 2016)........................................................................................35, 36, 37

*Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57 (D.D.C. 2013) *aff'd*, 795 F.3d
200 (D.C. Cir. 2015) ..........................................................................................43

*China Three Gorges Project Corp. v. Rotec Indus., Inc.*, No. CIV.A. 04-1510 JJF, 2005
WL 1813025 (D. Del. Aug. 2, 2005) ....................................................................17

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995) ..........................................32

*Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321 (D.C. Cir. 2014)..............31

*Commissions Imp. Exp. S.A. v. Republic of Congo*, No. CV 13-00713 (RJL), 2015 WL
13667748 (D.D.C. July 6, 2015)............................................................................33

*\*de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013)........................................33

*Eur. Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175 (2d Cir. 2005) ......................................30

*Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112 (D.D.C. 2015)..........43

*Herrion v. Children's Hosp. Nat. Med. Ctr.*, 448 F. App'x 71 (D.C. Cir. 2011) ..........................19

*\*Hilton v. Guyot*, 159 U.S. 113 (1895)........................................................................33, 34, 35

*In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171 (D.C. Cir. 1987), *aff'd*,
490 U.S. 122 (1989)..............................................................................................16

*In re Wilde*, 68 A.3d 749 (D.C. 2013) ........................................................................33

*Int'l Transactions, Ltd. v. Embotelladora Agral* , 347 F.3d 589 (5th Cir. 2003) .........................34

*June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103 (2020) .................................................................31

*Konoike Constr. Co. v. Ministry of Works*, No. CV 17-1986 (RJL), 2019 WL 1082337
 (D.D.C. Mar. 7, 2019)...............................................................................................................17

*\*Landis v. N. Am. Co.*, 299 U.S. 248 (1936) ......................................................................... 40-42

*Levy v. Republic of Guinea*, No. 19-cv-2405 (DLF), 2020 WL 3893019 (D.D.C. July 10,
 2020) .........................................................................................................................................15

*\*LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871 (D.C. Cir. 2021) ...........................42, 43

*Maersk, Inc. v. Neewra, Inc.*, No. 05 CIV. 4356 (CM), 2010 WL 2836134 (S.D.N.Y. July
 9, 2010), *aff'd* 450 F. App'x 3 (2d Cir. 2011) ...........................................................................34

*MarkDutchCo 1 B.V. v. Zeta Interactive Corp.*, 411 F. Supp. 3d 316 (D. Del. 2019) .................17

*Marker Volkl (Int'l) GmbH v. Epic Sports Int'l, Inc.*, 965 F. Supp. 2d 308 (S.D.N.Y.
 2013) .........................................................................................................................................17

*Marsh v. Johnson*, 263 F. Supp. 2d 49 (D.D.C. 2003) ..................................................................41

*Masdar Solar & Wind Cooperatief v. Kingdom of Spain*, 397 F. Supp. 3d 34 (D.D.C.
 2019) .........................................................................................................................................41

*MCI Telecom. Corp. v. F.C.C.*, 59 F.3d 1407 (D.C. Cir. 1995) .....................................................32

*Micula v. Romania*, 404 F. Supp. 3d 265 (D.D.C. 2019), *aff'd*, 805 F. App'x 1 (D.C. Cir.
 2020) ........................................................................................................................16,  20, 21, 31

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*
 863 F.3d 96 (2d Cir. 2017)................................................................................................16, 20, 21

*Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, No. 14 CIV. 8163 PAE,
 2015 WL 926011 (S.D.N.Y. Mar. 4, 2015) ..............................................................................44

*Nashville Lodging Co. v. Resol. Tr. Corp.*, 59 F.3d 236 (D.C. Cir. 1995) .............................32, 40

*Nat'l R.R. Passenger Corp. v. Se. Pennsylvania Transportation Auth.*, 518 F. Supp. 3d 19
 (D.D.C. 2021) ...........................................................................................................................34

*\*New Hampshire v. Maine*, 532 U.S. 742 (2001) .......................................................... 23, 27, 28

*\*Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14 (D.C. Cir. 2016).............................................17

*OI European Grp. v. Bolivarian Republic of Venezuela*, No.16-CV-1533 (ABJ), 2019
 WL 2185040 (D.D.C. May 21, 2019)................................................................................15, 44

*Pasquantino v. United States*, 544 U.S. 349 (2005) ............................................................30, 31

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012)................................44

*Ricart v. Pan Am. World Airways, Inc.*, No. CIV. A. 89-0768(HHG), 1990 WL 236080
    (D.D.C. Dec. 21, 1990) ............................................................................................34, 35

*Rive v. Briggs of Cancun, Inc.*, 82 F. App'x 359 (5th Cir. 2003) ...................................17

*Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58 (D.C. Cir. 2015)............................16

*TECO Guatemala Holdings, LLC v. Republic of Guatemala*, 414 F. Supp. 3d 94 (D.D.C.
    2019) ...............................................................................................14, 15, 16, 19

*Temple Univ. Hosp., Inc. v. Nat'l Lab. Rels. Bd.*, 929 F.3d 729 (D.C. Cir. 2019) .......................23

*Tenaris, S.A. v. Bolivarian Republic of Venezuela*, No. 1:18-CV-01373 (CJN), 2021 WL
    1177996 (D.D.C. Mar. 29, 2021)..........................................................................44, 45

*Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, No.
    10CV5256KMWDCF, 2016 WL 958640 (S.D.N.Y. Mar. 8, 2016).......................................32

*United States v. Lopesierra-Gutierrez*, 708 F.3d 193 (D.C. Cir. 2013)..........................................29

*United States v. Olano*, 507 U.S. 725 (1993).................................................................29

*United States v. Sum of $70,990,605*, 991 F. Supp. 2d 154 (D.D.C. 2013)...................................34

*United States v. York*, 909 F. Supp. 4 (D.D.C. 1995) ....................................................38

*Vantage Commodities Fin. Servs. I, LLC v. Willis Ltd.*, No. 1:17-CV-01451 (TNM), 2021
    WL 1226767 (D.D.C. Mar. 31, 2021)......................................................................23

*Wartsila Finland OY v. Duke Cap. LLC*, 518 F.3d 287 (5th Cir. 2008).......................................17

*Washington v. AlliedBarton Sec. Servs., LLC*, 748 F. App'x 348 (D.C. Cir. 2018)....................34

*Zuckerman Spaeder, LLP v. Auffenberg*, 646 F.3d 919 (D.C. Cir. 2011) ....................................29

STATUTES

*9 U.S.C. § 201 *et seq.*.............................................................................15, 16, 17, 21

*22 U.S.C. § 1650a.............................................2, 14, 15, 16, 17, 18, 19, 20, 21, 22, 30, 42, 44

28 U.S.C. § 1330.................................................................................................16

28 U.S.C. § 1605(a)(6).........................................................................................22

28 U.S.C. § 1738 ......................................................................................................19

28 U.S.C. § 1961(a) ............................................................................................44, 45

D.C. Code § 12-307 ................................................................................................38

D.C. Code §§ 15-361–15-371 ................................................................................32

D.C. Code § 15-363(b)(1) ..................................................................................33, 37

D.C. Code § 15-371 ................................................................................................37

**OTHER AUTHORITIES**

80 C.J.S., *Set–Off and Counterclaim* § 6 (updated 2021) ............................................38

Black's Law Dictionary (11th ed. 2019) ......................................................................24

*Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Stay of Enforcement, August 31, 2017 ................................................................28

*Chevron Corp. and Texaco Petroleum Co. v. Ecuador*, PCA Case No. 2009-23 ........................36

*Convention on the Settlement of Investment Disputes between States and Nationals of Other States ............................................................... 1, 2, 9, 12, 15, 18, 22, 24, 40

Fed. R. Civ. P. 62(a) ................................................................................................43

Restatement (Fourth) of Foreign Relations Law § 481, cmt. D (2018)........................................38

Restatement (Second) of Conflicts of Laws § 128 cmt. b (1971)................................................21

*Siemens v. Argentina*, ICSID Case No. ARB/02/8, Award, February 6, 2007 ..............................26

*Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda v. Bolivarian Republic of Venezuela (I)*, ICSID Case No. ARB/11/26, Award, 29 January 2016 ..............26

United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ........................................................................................ 16, 17, 18, 22, 43

U.S. State Department, Country Reports on Human Rights Practices for 2011, Ecuador ...........36

## PRELIMINARY STATEMENT

Perenco Ecuador Limited has satisfied all requirements under U.S. law for this Court immediately to enforce the International Centre for Settlement of Investment Disputes ("ICSID") arbitral award that an esteemed tribunal, headed by the former President of the International Court of Justice, rendered against the Republic of Ecuador, and which an annulment committee has now confirmed in the net amount of $392,665,310, as of September 20, 2021 (the "Award").

Ecuador has not asserted any actual defense to the Award itself, and both the ICSID Convention[1] and the U.S. implementing legislation foreclose any such defense.  Ecuador nevertheless attempts to manipulate what is supposed to be a swift and efficient enforcement process into an excuse to further, and even indefinitely, delay paying—as it has for over a dozen years already—full compensation to Perenco for its unlawful destruction and expropriation of Perenco's large and successful investment in two Ecuadorian oil blocks.

But Ecuador cannot defeat award enforcement by invoking approximately $70 million of vigorously contested Ecuadorian income tax claims.  Those claims are highly dubious, and by and large remain subject to continuing litigation in Ecuador.  But even without wading into the mire of convoluted facts about these tax claims that purport to reach back 19 years, at most they amount to less than 20% of what Ecuador owes under the Award.  They cannot justify Ecuador's failure to pay Perenco the remaining $320 million, to which—even on its own case—Ecuador has absolutely no defense at all.  Ecuador has nevertheless used this case as a fig leaf for its default on the Award, relying on its partial opposition and cross-motion to falsely tell "the international financial community and investors" that there are no "awards pending payment."[2]

---

[1] Convention on the Settlement of Investment Disputes between States and Nationals of Other States, ECF No. 1-5.

[2] Friedman Decl., Ex. 5, Ecuadorian Ministry of Economy and Finance, Press Release, *Ecuador and Perenco Continue Negotiations* (July 28, 2021).

Even more significantly, Ecuador's tax set-off defense fails for six independent reasons, most of which Ecuador has not even attempted to address:

*First*, the implementing legislation for the ICSID Convention, 22 U.S.C. § 1650a, does not permit set-off as a defense to enforcement of an ICSID arbitration award. That deliberate restriction of defenses is necessary to implement the Convention, which requires parties to assert any defenses during the arbitration itself, not in an enforcement phase. The ICSID Convention thus specifies that a contracting state—like the United States and 155 other countries—"shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award," and Section 1650a in turn provides that "[t]he pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a [U.S. state court]." A foreign state thus cannot interpose its own local claims and judgments to derogate from this clear national and international mandate to enforce—not relitigate—the pecuniary obligations of an ICSID award.

*Second*, Ecuador is judicially estopped from asserting any such opposition to enforcement. To win a stay of enforcement while it sought to annul the Award, Ecuador made an express and solemn promise to the Annulment Committee that went beyond its Convention obligation to "abide by and comply with the terms of the award." Ecuador's Minister of Economy and Finance, on behalf of the Republic, promised that if it did not succeed in annulling the Award it would pay it "unconditionally, voluntarily and in full, within 60 days" of the decision on annulment, "without such payment being . . . subject to enforcement proceedings."[3] The Committee relied on that promise in imposing a stay that barred Perenco from enforcing the

---

[3] *Perenco Ecuador Limited v. Republic of Ecuador*, ICSID Case No. ARB/08/6, Annulment Proceeding, Procedural Order No. 2 ¶ 4 (Apr. 21, 2020) , ECF No. 11-1 ("Procedural Order No. 2"); Friedman Decl., Ex. 3, Letter from Minister Richard Martínez Alvarado to the Members of the Annulment Committee, at 1-2 (Apr. 20, 2020); *see also* Decision on Stay of Enforcement ¶ 82(a) (Feb. 21, 2020), ECF No. 8-1 ("Stay Decision").

Award for over a year.  That 60-day period has elapsed, and Ecuador still has not paid Perenco even a single cent.  Estoppel now bars Ecuador from its attempt to impose conditions on payment, to pay the Award in part rather than in full, and to subject it to litigation in these enforcement proceedings rather than making voluntary payment.

*Third*, for similar reasons, Ecuador's promise also waived its right to contest enforcement.  Among other things, Ecuador specifically promised that it would not subject its payment to enforcement proceedings.  This was a knowing relinquishment of whatever right it might have had to subject its payment to arguments it might make in enforcement proceedings.

*Fourth*, the revenue rule prohibits U.S. courts from enforcing foreign tax claims and judgments and thus completely bars Ecuador's set-off defense.  Ecuador admits that its defense carries out its "basic obligation as a sovereign State to seek the collection of unpaid taxes."[4]  But the revenue rule bars our nation's courts from precisely that kind of assistance to foreign states' purported tax collection efforts.  As this Court—and many others—have repeatedly made clear, the revenue rule "prevents the courts of one sovereign from enforcing or adjudicating tax claims from another sovereign."  *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 249 (D.D.C. 2015), *aff'd*, 650 F. App'x 17 (D.C. Cir. 2016).  Ecuador's attempt to turn this Court into a collection arm of the Ecuadorian tax authorities thus must be dismissed.

*Fifth*, even if Ecuador could somehow overcome each and every one of those preclusive obstacles, there would still be no basis for affording comity to the $40 million in purportedly "final and enforceable" tax judgments or enforcing them under the District of Columbia's money

---

[4] Ecuador's Mem. in Supp. of Its Partial Opp. to Pet. to Enforce Arbitral Award and Cross-Mot. for Setoff 3, ECF No. 20-1 ("Partial Opp.").

judgment recognition statute.  Ecuador did not even attempt to discharge its burden of proof on this issue. It should not be permitted to attempt to do so on reply.

In any event, Ecuador could not discharge that burden.  The declaration of Emmanuel Colombel, Perenco S.A.'s Chief Financial Officer, and the expert report of Carmen Simone Lasso, a leading expert in Ecuadorian tax law and procedure, former tax judge, and former Vice Minister of Human Rights, describe recognition-defeating problems with the allegedly final tax judgments.  For example, the judgments and underlying assessments violate the most fundamental tenets of due process because they are time barred and purport to hold Perenco liable despite denying Perenco any opportunity to contest them in court.  Some of the assessments even relate to income that *Ecuador* itself made after it seized the oil blocks from Perenco.  And Ecuador concedes that over $30 million of the tax liability it alleges is not even final and cannot yet be enforced in this Court despite the long years that have passed.

Moreover, the adverse judgments were rendered at a time when—as another United States court and international observers have concluded—the Ecuadorian judiciary was not independent but was instead acting at the government's direction.  After recent changes that restored more independent judges, the courts have upheld Perenco's rights, including by invalidating Ecuador's attempts to enforce against Perenco a debt that Ecuador here claims is "final"—a development that neither Ecuador nor its expert have even mentioned here.

*Sixth*, even if the supposedly final Ecuadorian judgments were enforceable against Perenco, Ecuador cannot bear its burden of showing that it deserves an equitable set-off against the Award despite having promised to pay it "unconditionally" and "in full."  Ecuador's claim that Perenco is "insolvent" and this action might be its only hope to collect the alleged debt is simply not true.  Perenco is not insolvent, but in liquidation proceedings that are meant to resolve

all outstanding debts and are being overseen by Ecuadorian authorities.  In any event, after expropriating Perenco's entire investment in Ecuador—breaching both contract and international law—and reaping billions in revenue from that stolen investment, Ecuador cannot invoke this Court's equity jurisdiction based on Perenco's lack of in-country assets.

Ecuador must overcome every single one of these six hurdles.  But Ecuador cannot surmount even one of them, let alone all six.  This Court should accordingly deny Ecuador's cross-motion in its entirety and enforce the Award in favor of Perenco without delay, including the interest awarded until Ecuador's "full and final payment," which at present amounts to about $23,000 per day.

## BACKGROUND

### A.    Perenco and Ecuador's Underlying Dispute

The facts giving rise to the arbitration are not in dispute and have been settled by the ICSID tribunal (the "Tribunal").  *See Perenco Ecuador Limited v. Republic of Ecuador*, ICSID Case No. ARB/08/6, Decision on Remaining Issues of Jurisdiction and on Liability (September 12, 2014),  ECF No. 1-3 ("Decision on Liability").  In September 2002, Perenco first invested in two blocks of oil fields in the Ecuadorian Amazon, Blocks 7 and 21 (the "Blocks").  *Id.* ¶¶ 43, 70.  Perenco acquired a minority interest in the Blocks and the participation contracts that governed them (the "Participation Contracts") alongside Burlington Resources Oriente Limited ("Burlington") and Preussag Energie GmbH PBP ("Preussag").  *Id.* ¶ 70.  Pursuant to joint operating agreements among the three investors, Perenco was the sole operator for the Blocks. *Id.* ¶ 72.  In September 2005, Perenco and Burlington purchased Preussag's interests, and Perenco thereby acquired just over a majority stake (with a 53.75% stake in Block 21 and 57.5% in Block 7).  *Id.* ¶¶ 43, 73.

The Participation Contracts granted Perenco the right to explore and exploit the Blocks "on its own account and risk," and investing its own capital, in exchange for a share of the oil produced. *Id.* ¶¶ 70, 73-75. Ecuador had previously used "service contracts," which paid oil companies a fee but did not give them a share of the oil produced, and thus did not incentivize oil and gas development enough to meet the state's goals. *Id.* ¶¶ 55-56. In 1993, Ecuador switched to participation contracts "to make investment in its hydrocarbons industry more attractive." *Id.* ¶¶ 56-58. In reliance on its Participation Contracts and the upside potential they provided, Perenco invested significant sums to develop the two Blocks, including over $100 million in 2006 alone. *See id.* ¶ 104.

However, in April 2006, Ecuador decided to take a greater share of the oil than its contracts permitted. *Id.* ¶¶ 81-99. It enacted new legislation, known as Law 42. That law took from oil companies 50% of their revenues in excess of the "reference price," set as the oil price at the time their contracts were signed. *See id.* ¶¶ 96-99. The reference prices for Perenco were just $25.11 per barrel for Block 7 and $15.36 for Block 21 (subject to modest inflation adjustments), which were much lower than the 2006 market prices. *Id.* ¶ 96. Then, in 2007, Ecuador issued Decree 662, increasing Ecuador's share of revenues above that low reference price from 50% to 99%, to make oil companies give up their participation contracts and revert to services contracts. *See id.* ¶¶ 109-10, 407-09.

Even after this abrogation of the Participation Contracts, Perenco sought to negotiate with Ecuador. *Id.* ¶¶ 115-19, 121-25, 620-21. But when the parties seemed "relatively close to reaching . . . agreement," President Correa announced that Ecuador would terminate all participation contracts and replace them with service contracts. *Id.* ¶¶ 121-25; *see also* ¶¶ 610, 612. After President Correa scuttled the negotiations, on April 30, 2008, Perenco filed a request

for arbitration against Ecuador and Petroecuador (the state-owned oil company) under the Participation Contracts and the bilateral investment treaty between France and Ecuador ("France-Ecuador Treaty").  *See id.* ¶¶ 4, 6.  President Correa made clear that he would punish companies who had filed for arbitration, stating:  "Gentlemen, you're suing us? Very well, leave the country."[5]

In February 2009, Ecuador launched coercive collection measures, known as "*coactivas*," to forcibly seize Perenco's oil production to satisfy amounts allegedly due under Law 42.  *Id.* ¶ 152.  Perenco obtained an order of provisional measures from the ICSID Tribunal enjoining Ecuador from taking any action "to collect from Perenco any amounts owed . . . pursuant to Law 42" while the arbitration was pending.  *Id.* ¶¶ 21, 169, 417.  Regrettably, just a week later, Ecuador auctioned the seized oil, later selling it to Petroecuador at a 50% discount to market.  *Id.* ¶¶ 176, 195, 417.  Later in May, President Correa announced that Ecuador would withdraw from the ICSID Convention, which he said "signifie[d] colonialism, slavery with respect to transnationals, [and] with respect to Washington."[6]

Ecuador's decision to defy the Tribunal's injunction made it impossible for Perenco to keep operating the Blocks.  Perenco's "production was being seized in order to be sold (at a discount to the prevailing market price) in order to pay the debt" it allegedly owed under Law 42, and "[f]or every barrel of oil seized and sold by Ecuador, a new debt was being incurred under . . . Law 42."  *Id.* ¶ 434.  Perenco was thus entitled to suspend operations, *id.* ¶¶ 434-35, and it notified Ecuador on July 16, 2009 of its plan to do so, *id.* ¶ 202.  The same day, Ecuador

---

[5] Declaration of Emmanuel Colombel ("Colombel Decl.") ¶ 22, Ex. 4 (Rafael Correa's Speech of June 20, 2009).

[6] F.C. Diaz, *Ecuador continues exit from ICSID*, International Institute for Sustainable Development, June 8, 2009, https://perma.cc/C7R2-LUG4.  Ecuador's withdrawal took effect in January 2010, but pursuant to Convention Article 72 it did not affect Ecuador's obligations as to Perenco's claims.  *Denunciation of the ICSID Convention by Ecuador*, International Center for Settlement of Investment Disputes July 9, 2009, https://perma.cc/VX6P-KDDQ.

physically took control of the Blocks.  *See id.* ¶¶ 204-06.  On July 20, 2010, Ecuador formally

terminated the Participation Contracts by declaring their "*caducidad*."  *Id.* ¶ 215.

### B.     The ICSID Award in Favor of Perenco

On September 27, 2019, following over a decade of arbitration, the Tribunal issued the

final Award in favor of Perenco.  Award, ECF No. 1-2.  The Tribunal had earlier concluded that

Ecuador breached both the France-Ecuador Treaty and the Participation Contracts, including

through Decree 662, its coercive conduct, and the declaration of *caducidad*, Decision on

Liability ¶¶ 402-11, 442, 607, 710-11, ECF No. 1-3.  In the Award, the Tribunal also criticized

Ecuador for failing to comply with its Provisional Measures Decision and proceeding with the

"*coactivas*," finding that otherwise "Perenco would likely still be operating both Blocks," and

"[t]his arbitration would not have lasted 11 years."  Award ¶¶ 979-80.

The Tribunal ordered Ecuador to pay Perenco approximately $448 million in damages,

$23 million in legal fees, and interest.  *Id.* ¶ 1023(a), (c).  The Tribunal also addressed Ecuador's

$2.5 billion counterclaims against Perenco for alleged damage to the Blocks' environment and

equipment, which it concluded "were overstated" and based on "exaggerated allegations of an

environmental catastrophe."  *Id.* ¶¶ 1010, 1015.  The Tribunal ordered Perenco to pay Ecuador

approximately $54 million in damages, $6 million in fees, as well as just under $50,000 in fees to

Petroecuador, plus interest.[7]  *Id.* ¶ 1023(b), (d), (e).

---

[7] Contrary to Ecuador's claims, the Petition did not "mistakenly state[] that the interest on the costs award to PetroEcuador began to accrue on October 1, 2019," rather than June 30, 2011.  Partial Opp. 10 n.13, 28.  As the Petition stated, it had already included the interest accrued on Petroecuador's award through October 1, 2019 in the net amount due to Perenco as of that date (*i.e.* when the Petition was filed), and it therefore requested ***further*** interest accruing only from that date.  *See* Petition ¶¶ 27-28, ECF No. 1.  Perenco's request for relief, *infra*, and Proposed Order also calculate the net amount due to Perenco, with interest, as of the date of this filing, and request additional interest accruing from this date forward.

**C.      Perenco Seeks Enforcement of the Award in this Court**

On October 1, 2019, Perenco commenced this action. Petition to Enforce Arbitral Award, ECF No. 1 ("Petition").  Perenco asked this Court to "enter an order recognizing the Award and enforcing it in the same manner as a final judgment issued by a court in the United States," and to enter judgment "against Ecuador in the net amount set forth in the Award."  *Id.* ¶ 5.

**D.      Ecuador Seeks to Annul the Award and Guarantees Payment in Exchange for the Committee's Stay of Enforcement**

On October 2, 2019, Ecuador submitted to ICSID an application to annul the Award and stay its enforcement.  Stay Decision ¶¶ 1, 23, ECF No. 8-1.  The parties duly notified this Court of Ecuador's applications on December 9, 2019.  *See* Joint Stipulation and Order, Dec. 9, 2019, ECF No. 7 ("Joint Stipulation").  The parties agreed that this action would be stayed "for 60 days following expiration of the" stay imposed in the annulment proceeding.  *Id.* ¶¶ 1-2.  They also agreed that "Service on the Republic of the Summons and Petition . . . shall be deemed effective upon entry of this Stipulation and Order."  *Id.* ¶ 5.  This Court construed the stipulation "as a motion to stay and . . . GRANT[ED] the motion."  Minute Order, Dec. 26, 2019.

Before the *ad hoc* Committee constituted to resolve Ecuador's annulment application (the "Committee"), Perenco opposed any further stay, arguing that Ecuador had not shown that "the circumstances . . . require[d]" suspending enforcement under Article 52(5) of the ICSID Convention.  Stay Decision ¶¶ 13-19.  Perenco also requested that, in case of a stay, Ecuador post financial security for the amount of the Award "because of the serious risk of Ecuador's non-compliance."  *Id.* ¶¶ 21-22.

At a hearing on Ecuador's stay application in January 2020, Ecuador's Attorney General, Dr. Íñigo Salvador Crespo, denied that Perenco had "shown that Ecuador is not going to comply with the Award," and pledged that "if this Committee were to reject the Request for Annulment

submitted by Ecuador, the State shall proceed to carry out the obligations stemming from that Award."  Friedman Decl., Ex. 1, *Perenco v. Ecuador*, Annulment Proceeding, First Session and Hearing on Stay of Enforcement Transcript at 13, 108 (January 13, 2020) ("Stay Tr.").  He also read into the record a statement by Ecuador's then-Minister of Economy and Finance—Richard Martínez Alvarado—pledging that if "this Committee decides to reject the Request for Annulment of the Award submitted by Ecuador, Ecuador will honor its obligations stemming therefrom."  *Id.* 109.[8]  Perenco rejected these assurances as insufficient absent financial security, *id.* 53-58, 87-90, and argued that Ecuador should instead commit that "[i]f we lose our annulment, we will voluntarily, promptly, and without reservation pay the Award in full."  Stay Tr. 141; *see also id.* 159-62.  Ecuador responded that it had already "clearly sa[id] that Ecuador will pay the amount of the Award if you reject the Annulment."  *Id.* 166.

On February 21, 2020, the Committee stayed enforcement of the Award on the condition that Ecuador commit to paying it.  The Committee noted that it shared Perenco's concern that Ecuador had not provided "a clear commitment . . . to pay the Award voluntarily, promptly, and in full in case it is not annulled."  Stay Decision ¶ 74.  It said that an undertaking could mitigate the risk of a state failing to "comply with the award if and to the extent that the annulment application is rejected," but rejected Minister Martínez's existing pledge as "insufficient as it does not contain a clear and specific undertaking related to the Award," *id.* ¶¶ 69, 77.

The Committee thus stayed enforcement of the Award on the condition that Ecuador:

> provide the *ad hoc* Committee, within 60 days following this decision, with a letter signed by Ecuador's Minister of Finance or the official having full authority to bind Ecuador, committing to pay the Award unconditionally, voluntarily and in full, within 60 days after the Committee decides on the Application for Annulment, if the Application for Annulment were not to be upheld in full or in

---

[8] Ecuador's counsel also introduced the statement as an exhibit at the hearing.  *See* Friedman Decl. ¶ 4 & Ex. 2.

part, and attesting that such payment shall not be subject to any enforcement proceedings or to the intervention of Ecuador's courts.

Stay Decision ¶ 80(a).  On April 20, 2020, Ecuador submitted a letter signed by Minister

Martínez stating that:

> in case Ecuador's application for annulment were not to be upheld in full or in part, the Republic of Ecuador commits to pay the Award unconditionally, voluntarily and in full, within 60 days counted as from the decision of the Committee on the application for annulment, without such payment being . . . subject to enforcement proceedings or to the intervention of Ecuador's courts.

(the "Payment Undertaking").  Procedural Order No. 2 ¶ 4, ECF No. 11-1; *see also* Friedman

Decl., Ex. 3, Letter from Minister Martínez to the Members of the Annulment Committee, at 1-2.

The Committee maintained the stay because it found that the Payment Undertaking "complie[d]

in form and substance with" its Stay Decision.  *Id.* ¶¶ 5–6.  That decision also extended this

Court's stay pursuant to the Parties' Joint Stipulation.  *See* Joint Stipulation ¶¶ 1-2 (stay to

"remain in effect for 60 days following expiration of . . . the Further Stay").

### E.      The Committee Upholds the Award Almost Entirely

On May 28, 2021, the Committee issued a unanimous decision concluding the ICSID

proceeding.  *Perenco Ecuador Limited v. Republic of Ecuador*, ICSID Case No. ARB/08/6,

Annulment Proceeding, Decision on Annulment (May 28, 2021), ECF No. 15-1 ("Decision").

The Committee upheld the Award almost entirely, rejecting 18 of Ecuador's 20 grounds for

annulment, but reduced the damages in favor of Perenco by around $36 million, from

$448,820,400 to $412,182,000.  *Id.* ¶ 744(a)-(b) (amending paragraph 1023(a) of the Award).

The Committee reasoned that the Tribunal had failed to state its reasons for (*i*) awarding Perenco

damages for its "loss of opportunity" on a planned extension of certain operations and

(*ii*) determining that certain oil transportation costs were tax deductible for purposes of the

damages calculation.  *Id.* ¶¶ 429, 469-70, 574, 725.  The Committee annulled those aspects of the

Award under Article 52(1)(e) of the ICSID Convention, which allows annulment where an award fails "to state the reasons on which it is based," but issued no ruling on the merits of those issues.

The Committee expressly confirmed that the rest of the Award was "unaffected." Decision ¶ 744(b).  In a Supplemental Joint Status Report, the parties agreed that the net amount with interest due to Perenco under the Award was $391,393,984 as of July 27, 2021, "subject to additional post-Award interest until full and final payment."  ECF No. 17, at 2.  As of September 20, 2021, that updated net amount is $392,665,310.

The Committee also "recall[ed] the commitment" Ecuador made in the Payment Undertaking "as a condition requested by the Committee to grant the stay," and ordered that the "stay of enforcement of the Award is lifted."  Decision ¶¶ 734, 744(d).  The Committee ordered Ecuador to pay 90% of the annulment phase costs because almost all of its challenges were rejected as "mere appeals of the Award," which are not permitted under Article 52(1).  *Id.* ¶ 741.

### F.   Ecuador Reneges on Its Payment Undertaking and Perenco Resumes Enforcement Proceedings in this Court

The Committee's Decision on May 28, 2021, triggered the 60-day period within which Ecuador had promised "to pay the Award unconditionally, voluntarily and in full."  Procedural Order No. 2 ¶ 4.  Ecuador was thus required to complete payment by July 27, 2021.  On July 1, 2021, Attorney General Salvador advised Ecuador's new President, Guillermo Lasso, of the Committee's Decision, and concluded that "the amount ***that Ecuador must pay Perenco*** is US$ 374,373,154.25, plus the interest generated until the time of payment."[9]  The Attorney General recited Ecuador's Payment Undertaking requiring payment within 60 days of the

---

[9] Friedman Decl., Ex. 4, Letter from Dr. Salvador to President Lasso dated July 1, 2021 ("Salvador Letter") (emphasis added).

Committee's decision and instructed that "the competent entities should . . . ensure compliance with this international obligation." Salvador Letter, Friedman Decl., Ex. 4, at 2.

Ecuador did not "pay the Award unconditionally, voluntarily and in full," "without such payment being . . . subject to enforcement proceedings," by July 27, 2021. In fact, it has not paid anything. Declaration of Emmanuel Colombel ¶ 5 ("Colombel Decl."). Instead, it has again sought to avoid and postpone that payment by seeking to set off Perenco's alleged tax liabilities and partially stay enforcement pending the resolution of alleged tax liabilities. See Ecuador's Mem. in Supp. of Its Partial Opp. to Pet. to Enforce Arbitral Award and Cross-Mot. for Setoff, ECF No. 20-1 ("Partial Opp.").

Ecuador misrepresents both the facts giving rise to Perenco's alleged tax liability and the status of the Ecuadorian tax proceedings. In fact, as discussed in greater detail below, the alleged tax that Ecuador seeks to enforce has spawned over a decade of administrative and judicial proceedings that are still highly disputed and will take years to resolve. Colombel Decl. ¶¶ 7, 52-62; Expert Report of Carmen Amalia Simone Lasso ("Simone Rep.") ¶¶ 12-14, 15, 54-106. The income tax assessments that Ecuador claims have been "fully adjudicated" are in fact largely time-barred, were issued against non-existent entities in violation of Ecuadorian law and practice, and—in what Mr. Colombel calls a "heads I win, tails you lose" move—the tax authorities charged against Perenco, but the Ecuadorian courts did not allow Perenco to contest. Colombel Decl. ¶¶ 52-62; Simone Rep. ¶¶ 74-95.

These aberrant decisions were issued during a political stripping of the Ecuadorian courts by former President Correa that drew widespread international condemnation, including from Human Rights Watch, the SDNY court, and an international arbitration panel. Many of these kowtowing judges have now been replaced. See Simone Rep. ¶¶ 107-17. So in a July 2021

13

decision, which Ecuador has not disclosed to this honorable Court, an Ecuadorian court struck

down one of the payment orders against Perenco because the SRI (Ecuador's *Servicio de Rentas*

*Internas*, or Internal Revenue Service) had issued the allegedly "final and enforceable"

underlying tax assessments against other entities and Perenco was deprived of its right to be

heard to challenge them.  Colombel Decl. ¶ 65; Simone Rep. ¶ 63(a).

Meanwhile, Perenco's court challenges to the assessments that Ecuador admits are not

yet final have been progressing at a glacial pace.  Colombel Decl. ¶¶ 7, 55, 59-60.  For example,

what Ecuador claims is a final judgment on the oldest of these unlawful assessments—for fiscal

year 2002—is in fact still awaiting a decision on appeal, almost two decades later.  Colombel

Decl. ¶ 58; Simone Rep. ¶¶ 60, 66.  These pending claims, too, will take months and years to be

resolved, and even then Ecuador would have to run the gauntlet of the entirely separate

collection process before they could become enforceable against Perenco.  *See* Simone Rep.

¶¶ 17, 52 (Table No. 1), 57-60, 62, 73 (Table No. 2).

## ARGUMENT

### I.   Perenco Has Indisputably Satisfied the Requirements for Enforcing the Award Under the U.S. Implementing Legislation for the ICSID Convention

Perenco has satisfied all requirements for enforcing an ICSID award under 22 U.S.C.

§ 1650a.  The statute accordingly requires this Court simply to enforce the Award, as issued,

without the kind of collateral litigation Ecuador proposes.

Section 1650a is deliberately straightforward because it fulfills the United States' ICSID

Convention obligation "to streamline the enforcement of authenticated ICSID arbitral awards,"

like the one at issue here.  *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, 414 F.

Supp. 3d 94, 101 (D.D.C. 2019).  The Convention is "aimed at encouraging and facilitating

private foreign investment in developing countries" and provides "a framework for adjudicating

investor-state disputes." *Levy v. Republic of Guinea*, No. 19-cv-2405 (DLF), 2020 WL 3893019, *1 (D.D.C. July 10, 2020). Article 53(1) provides that ICSID awards "shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention," and requires parties to "abide by and comply with the terms of the award." Article 54 provides that contracting states—including Ecuador and the United States—"shall recognize an [ICSID] award as binding and enforce the pecuniary obligations imposed by that award." The United States implemented the Convention at 22 U.S.C. § 1650a, which provides that an ICSID award "shall create a right arising under a treaty of the United States," and "[t]he pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a" state court.

In light of these provisions, U.S. courts are "not permitted to examine an ICSID award's merits, its compliance with international law, or the ICSID tribunal's jurisdiction." *OI European Grp. v. Bolivarian Republic of Venezuela*, No.16-CV-1533 (ABJ), 2019 WL 2185040, at *4 (D.D.C. May 21, 2019). Instead, this Court must ensure only that "it has subject-matter and personal jurisdiction," that "the award is authentic," and that "its enforcement order is consistent with the award" before according it the "binding effect required under the Convention." *TECO Guatemala Holdings*, 414 F. Supp. 3d at 101-02.

This highly circumscribed judicial review is unique to ICSID awards. Most foreign arbitral awards enforced in the United States are subject to a higher degree of scrutiny under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention") and its implementing legislation, Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.* ("FAA"). A court may decline to enforce such an award only if it "finds one of the grounds for refusal or deferral of recognition or enforcement of the award

15

specified in the said Convention."  9 U.S.C. § 207.  Article V of the Convention lists grounds

such as lack of notice of the proceedings or an award in excess of the arbitration agreement's

scope.  Section 1650a, however, provides that the FAA "shall not apply to enforcement of

awards rendered pursuant to the [ICSID] convention," and thus "expressly preclude[s] courts

from engaging in the more robust—although still extremely limited . . .—form of judicial review

applicable under the [FAA]."  *TECO Guatemala Holdings*, 414 F. Supp. 3d at 101.

Each of the requirements for enforcing an ICSID award is met here.  This Court has

subject-matter jurisdiction under both Section 1650a and the Foreign Sovereign Immunities Act

("FSIA").  *See* Petition ¶¶ 10-11 (citing § 1650a(b); 28 U.S.C. §§ 1330(a) & 1605(a)(1), (a)(6)).

This Court also has personal jurisdiction over Ecuador pursuant to the FSIA.  *See id.* ¶ 12 (citing

28 U.S.C. § 1330(b)).  Perenco has filed authenticated copies of the Award and the Decision with

this Court, Award, ECF No. 1-2; Decision, ECF No. 15-1, and the relief Perenco seeks is

consistent with the Award.  Ecuador does not dispute any of these facts.  Consequently,

regardless of any other facts Ecuador hopes to raise, the Award is thus immediately enforceable

under Section 1650a and the ICSID Convention.

## II.   Section 1650a Forecloses Ecuador's Set-Off Defense

Ecuador's entire opposition is groundless because Section 1650a does not permit set-offs

against an ICSID award.  Any other conclusion would disregard the statute's text and abrogate

the ICSID Convention framework that Section 1650a implements.  The two cases Ecuador cites

do not warrant a different conclusion.[10]  Neither case binds this court,[11] neither considered that

---

[10] Partial Opp. 24-27 (citing *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, 863 F.3d 96 (2d Cir. 2017); *Micula v. Gov't of Romania*, 404 F. Supp. 3d 265 (D.D.C. 2019), *aff'd*, 805 F. App'x 1 (D.C. Cir. 2020)).

[11] *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) ("Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that

Section 1650a nowhere provides for set-offs, and both were based on a mistaken and illogical reading of Section 1650a to require only enforcement, not recognition, of ICSID awards.

A.    **Section 1650a Prohibits Set-Offs Against ICSID Awards**

Section 1650a implements the Convention by strictly limiting judicial review of an ICSID award in a way that does not permit set-off as a defense.

This Circuit has established that where a statute requiring U.S. courts to enforce foreign arbitral awards does not provide for courts to apply set-offs, they are prohibited.  In *Newco Ltd. v. Gov't of Belize*, 650 F. App'x 14 (D.C. Cir. 2016), Belize sought to resist enforcement of a New York Convention award under Chapter 2 of the FAA based on a ruling by its Supreme Court that allowed it "to subtract unpaid taxes" from the award.  *Id.* at 16.  The court denied Belize's request because according comity to the Belizean judgment was not one of the grounds for denying recognition and enforcement under the New York Convention and the FAA.  *Id.* This Court has also twice rejected such set-off defenses.  *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 159 (D.D.C. 2018) (denying Ghana's request to take notice of a local judgment that allegedly "more than offsets" the award because a court "may refuse to enforce the award only on the grounds explicitly set forth in . . . the [New York] Convention"); *Konoike Constr. Co. v. Ministry of Works*, No. CV 17-1986 (RJL), 2019 WL 1082337, at *4 (D.D.C. Mar. 7, 2019) (rejecting Tanzania's argument based on "a tax set off" in part for the same reason).  Other courts have reached the same conclusion.[12]

---

circuit."), *aff'd*, 490 U.S. 122 (1989); *Salazar ex rel. Salazar v. District of Columbia*, 809 F.3d 58, 65, n.1 (D.C. Cir. 2015) ("district court cases [are] not binding precedent for this Court or the trial court.").

[12] *Rive v. Briggs of Cancun, Inc.*, 82 F. App'x 359, 363 n.3 (5th Cir. 2003) ("Because setoff and waiver are affirmative defenses to enforcement of the award that are not listed in Article V of the Convention, the district court properly rejected these claims . . . ."); *China Three Gorges Project Corp. v. Rotec Indus., Inc.*, No. CIV.A. 04-1510 JJF, 2005 WL 1813025, at *3 (D. Del. Aug. 2, 2005) (holding "setoff issue is not properly before the Court" because the respondent had cited "no Article V ground for its claim that the award should be reduced" and "the Court's role

Because Section 1650a, like Chapter 2 of the FAA, lacks any provision for a set-off defense to an ICSID award, such set-offs are prohibited.  And because Section 1650a provides for even more limited judicial review of ICSID awards than of New York Convention awards, this conclusion must be even more compelling for ICSID awards.  *See*, *supra*, pp. 15-16.  After all, the ICSID Convention, unlike the New York Convention, provides for a self-contained dispute resolution regime.  It permits parties to assert claims and counterclaims, which the tribunal will decide.  *See* Article 46.  Once an award is rendered, however, it "shall not be subject to any appeal or to any other remedy except those provided for in this Convention."  Article 53(1).  The Convention's post-award remedies are limited, and all of them occur within the ICSID system.[13]

Hence the role for courts is not to hear new and additional defenses that a party chose not to raise in the ICSID arbitration.  It is instead simply to "recognize an award rendered pursuant to this Convention as binding and enforce [its] pecuniary obligations."  Article 54(1).  The time and place for Ecuador to have asserted any claims against Perenco for payment of alleged income tax to reduce its liability in the Award was thus in the ICSID proceedings, just like it did for the environmental and infrastructure counterclaims that it chose to assert.  *See* Award ¶ 1023(b).  Ecuador chose not to similarly assert alleged tax liabilities.  It is too late, and this is the wrong forum, to do so now.

---

is limited to reviewing the parties' challenges to the arbitrator's decision"); *Wartsila Finland OY v. Duke Cap. LLC*, 518 F.3d 287, 295 (5th Cir. 2008) (holding district court properly "confirmed and enforced" an award providing that one party "must pay" the other, despite award-debtor's arguments that the award allowed for a set-off of potential future award against award-creditor in a different pending arbitration proceeding); *cf. Marker Volkl (Int'l) GmbH v. Epic Sports Int'l, Inc.*, 965 F. Supp. 2d 308, 311 (S.D.N.Y. 2013) ("Actions to confirm arbitration awards" "are straightforward proceedings in which no other claims are to be adjudicated."); *MarkDutchCo 1 B.V. v. Zeta Interactive Corp.*, 411 F. Supp. 3d 316, 329 (D. Del. 2019) ("judges in this district have not allowed defendants to assert unrelated counterclaims when doing so would delay arbitration confirmation proceedings").

[13] *See* ICSID Convention, Article 50 (interpretation); *id* Article 51 (revision); *id.* Article 52 (annulment).

*TECO Guatemala* correspondingly held that "federal courts must accord ICSID awards the same binding effect required under the Convention."  414 F. Supp. 3d at 101-02.  Following Section 1650a's mandate to give an ICSID award the "same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States," the court looked to the "established procedures for enforcing state court judgments in federal court."  *Id.* Those procedures are set forth in the Full Faith and Credit Act, 28 U.S.C. § 1738, which requires federal courts to accord a state court judgment "the same respect that it would receive in the courts of the rendering State."  *Herrion v. Children's Hosp. Nat. Med. Ctr.*, 448 F. App'x 71, 72 (D.C. Cir. 2011).  The same principle applies to ICSID awards.  "[I]f the state court—or, here, the ICSID—would treat the judgment—or, here, the award—as binding, so must the federal district court."  *TECO Guatemala Holdings*, 414 F. Supp. 3d at 102; *see also id.* at 103 (rejecting request to vacate ICSID award because "[n]othing in the ICSID Convention permits a member-state's courts to vacate an award").  Nothing in the Convention permits a contracting state to alter or reduce an award by applying a set-off after the award has been issued and the Convention's post-award proceedings have concluded.  Accordingly, neither does Section 1650a.

Moreover, there are important reasons why Section 1650a requires enforcing ICSID awards without setting off judgments issued by the award-debtor's own local courts.  Over 150 states have ratified the ICSID Convention and its requirement to abide by and enforce ICSID awards subject to only strictly limited judicial review,[14] in part because the Convention also establishes neutral and widely-respected dispute resolution procedures.  Placing an award-debtor's local court judgments—which are not governed by any similar requirements for neutral

---

[14] *Database of ICSID Member States*, International Center for Settlement of Investment Disputes, https://icsid.worldbank.org/about/member-states/database-of-member-states (Last visited 9/20/2021).

dispute resolution and, unsurprisingly, are not subject to a similar global enforcement regime—on the same footing as an ICSID award undermines the integrity and effectiveness of the international system that these nations, including the United States, have established.

### B.   *Mobil* and *Micula* Do Not Compel a Contrary Conclusion

Neither of the two cases that Ecuador cites rebut this analysis or warrant set-off.  *See* Partial Opp. 24-27 (citing *Mobil Cerro Negro, Ltd.*, 863 F.3d 96; *Micula*, 404 F. Supp. 3d 265).

*Mobil* was not a set-off case.  Instead, the Second Circuit held that a proceeding to enforce an ICSID award must comply with the FSIA's procedural requirements for suits against a foreign state, including service requirements, and therefore cannot be *ex parte*.  863 F.3d at 99-100.  In rejecting the argument that a contested proceeding would conflict with Section 1650a's mandate that courts enforce ICSID awards without permitting the award-debtor to make substantive challenges, the court mentioned that "non-merits challenges to the award" were available, "*for example . . . the possibility that an offset might apply to the award*."  *Id.* at 116-18, 121 (emphasis added).

The Second Circuit's offhand reference to the "possibility" of set-off was unsupported dicta.  The award-debtor had not requested that the district or appellate courts apply a set-off.  The question before the Second Circuit was instead whether the FSIA's procedural requirements applied to a proceeding to enforce an ICSID award; exactly which "non-merits challenges" are available in such an action had no bearing on the court's holding that the FSIA applies.  The FSIA does not guarantee a set-off defense, and hence does not conflict with Section 1650a on that issue.  Yet the court cited no authority for its supposition that set-off in particular might be an available "non-merits challenge."  The court did not examine set-off in particular, and appears not to have considered the argument that Section 1650a's mandate that U.S. courts give ICSID awards the "same full faith and credit as" state court judgments prohibits any set-off.

Despite these analytical problems, in *Micula*, this Court accepted *Mobil*'s unexamined dicta and held—incorrectly—that "the defense of setoff" "is available" in an action to enforce an ICSID award. 404 F. Supp. 3d at 283. Like *Mobil*, *Micula* did not properly assess whether Section 1650a permits set-offs against ICSID awards. Instead, it cited *Mobil* and an inapplicable provision of the Restatement (Second) of Conflicts of Laws on *state* courts' treatment of sister states' judgments, rather than *federal* courts' treatment of state judgments, as Section 1650a requires. *Id.* (citing § 116). And, as Ecuador concedes, the court did not ultimately apply a tax set-off because the award-debtor did not have a right to the amount it sought to set off. *Id.* at 284.

Moreover, both *Mobil* and *Micula* mistakenly assumed that a set-off was permissible because they thought that 1650a requires only enforcement, and not recognition, of ICSID awards. *Mobil Cerro Negro, Ltd.*, 863 F.3d at 118-21 & n.18; *Micula*, 404 F. Supp. 3d at 283. This was a puzzling and incorrect assumption. Neither case explains why any such distinction should determine the availability of a set-off, and there is no obvious reason that it should. In fact, Section 1650a does provide for both recognition and enforcement of ICSID awards, implementing the United States' duty under the Convention to "recognize" awards and "enforce [their] pecuniary obligations," Article 54(1), by instructing that the award "shall create a right arising under a treaty of the United States" and its pecuniary obligations "shall be enforced."

In any event, as *Mobil* itself acknowledged, there is "variability in usage of the words 'confirmation,' 'recognition,' and 'enforcement,'" 863 F.3d at 118 n.18, and the Second Circuit has looked beyond semantic differences in treaty and statutory text. For example, the New York Convention refers to "recognition and enforcement," while its implementing legislation requires

courts to "confirm" awards, 9 U.S.C. § 207, and the FSIA reflects this terminology.[15]  The

Second Circuit has nevertheless acknowledged "that the term 'confirm' as used in Section 207 is

the equivalent of 'recognition and enforcement' as used in the New York Convention," and that

both iterations refer to a "single-step process for reducing a foreign arbitral award to a domestic

judgment."  *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 72 (2d Cir. 2017).

A U.S. court's reduction of an ICSID award to a judgment under Section 1650a should likewise

be understood as—and is in practice—a "single-step process" for both recognition and

enforcement.  Accordingly, this Court should reject both the mistaken premise that Section

1650a does not provide for recognition, and the resulting conclusion that set-off should be an

available defense.

### III. Ecuador Is Judicially Estopped from Asserting and Has Waived Any Objection to Enforcement of the Award

Even if Section 1650a did not bar Ecuador's claim for a set-off, Ecuador is judicially

estopped from asserting, and has waived, any objections to enforcement.  The ICSID Convention

provides that awards "shall be binding on the parties," who must "abide by and comply with the

terms of the award."  Article 53(1).  Skeptical about Ecuador's willingness to comply with this

general legal obligation, the Committee conditioned an enforcement stay on Ecuador further and

more specifically undertaking to "pay the Award unconditionally, voluntarily and in full, within

60 days" of the decision on annulment and "without such payment being subject . . . to

enforcement proceedings."  Procedural Order No. 2 ¶ 4, ECF No. 11-1.  Ecuador solemnly and

expressly gave that undertaking, and thereby secured a 13-month stay of enforcement.  The

doctrines of judicial estoppel and waiver prohibit Ecuador from now reneging on that promise.

---

[15] 28 U.S.C. § 1605(a)(6) (foreign states are not immune from suits "to **confirm** an award" if "the agreement or award is or may be governed by a treaty or other international agreement . . . calling for the **recognition and enforcement** of arbitral awards" (emphasis added)).

### A.  Judicial Estoppel

The doctrine of judicial estoppel establishes that "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [it] may not thereafter, simply because [its] interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  "Courts have applied judicial estoppel when the prior proceeding was an arbitration." *E.g.*, *Vantage Commodities Fin. Servs. I, LLC v. Willis Ltd.*, No. 1:17-CV-01451 (TNM), 2021 WL 1226767, at *7 (D.D.C. Mar. 31, 2021).  All three factors that courts consider in deciding whether to apply judicial estoppel weigh in favor of prohibiting Ecuador from resisting enforcement.  *Maine*, 532 U.S. at 750-51; *see also Temple Univ. Hosp., Inc. v. Nat'l Lab. Rels. Bd.*, 929 F.3d 729, 733 (D.C. Cir. 2019).

*First*, Ecuador's "later position [is] 'clearly inconsistent' with its earlier position." *Maine*, 532 U.S. at 750.  Ecuador initially represented to the Committee that:

> in case Ecuador's application for annulment were not to be upheld in full or in part, the Republic of Ecuador commits to pay the Award unconditionally, voluntarily and in full, within 60 days counted as from the decision of the Committee on the application for annulment, without such payment being . . . subject to enforcement proceedings or to the intervention of Ecuador's courts.

Procedural Order No. 2 ¶ 4, ECF No. 11-1.  That undertaking is clearly inconsistent with Ecuador now resisting enforcement in this Court.  Ecuador pledged to pay "in full," yet it is now seeking a set-off and a stay.  It pledged to pay "unconditionally," yet it asks this Court not to enforce the Award without granting a set-off and stay.  It pledged to pay "within 60 days" of the Committee's decision—by July 27, 2021—yet it has not even paid the over $320 million of the Award that it concedes is enforceable, or anything at all.  And it pledged to pay "voluntarily," and "without such payment being . . . subject to enforcement proceedings," yet it has forced Perenco to seek court intervention and is resisting enforcement.  Ecuador's protests

notwithstanding, it has therefore "'defaulted' on the Award," Partial Opp. 3, simply because it has not paid it.[16]

Ecuador's absurd contention that its Payment Undertaking does not apply because the Committee partially annulled the Award as to a fraction of the damages in favor of Perenco is contrary to the text, context, and purpose of the undertaking.  *See* Partial Opp. 12-14.  The only reasonable interpretation of Ecuador's promise to pay the Award "in case Ecuador's application for annulment were not to be upheld in full or in part" is that it committed to pay the Award **to the extent it was not annulled**.

The Payment Undertaking's context and purpose support this plain-text reading, as both the Committee's Stay Decision and the parties' submissions show that it was meant to guarantee Ecuador's payment of the Award insofar as it was not annulled.  The Committee explained that an undertaking mitigates the risk of a state failing to "comply with the award **if and to the extent that** the annulment application is rejected."  Stay Decision ¶ 69 (emphasis added) , ECF No. 8-1. The Committee rejected Ecuador's assurance at the hearing that it would "honor its obligations stemming" from the Award, Stay Tr. 109, Friedman Decl., Ex. 1, and thus "abide by and comply with the terms of the award" under Article 53(1) of the ICSID Convention, as "insufficient," and instead required Ecuador to give the more specific Payment Undertaking, Stay Decision ¶¶ 77, 82.  Ecuador's reading of the Payment Undertaking as committing Ecuador to do **less** than it was already required to do by Article 53(1) would achieve the opposite of the Committee's stated intent.

---

[16] Black's Law Dictionary (11th ed. 2019) (Default is "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due.").

Indeed, in its Decision partially annulling the Award, the Committee "recall[ed] the commitment" made in the Payment Undertaking "as a condition requested by the Committee to grant the stay of enforcement."  Decision ¶ 734, ECF No. 15-1.  It would have made no sense for the Committee to specifically recall that commitment if it did not apply to the partially annulled Award.  There is no sign that the Committee sought, with no logical basis, to require Ecuador to pay the Award within 60 days if it was upheld in full, but not if it was reduced by a single dollar.

Rather, Ecuador's interpretation of the Payment Undertaking was crafted for the purpose of evading enforcement in this litigation.  Ecuador never so much as suggested that it would not pay the Award if it was partially annulled, or that the undertaking permitted it to do so.  To the contrary, Attorney General Salvador, who argued to the Committee that Ecuador would "abide by its international obligations," Stay Tr. 14, Friedman Decl., Ex. 1, advised President Lasso following the Decision that Ecuador must pay the full amount of the Award.  Salvador Letter, Friedman Decl., Ex. 4.  He explained that the Committee had issued a decision on May 28, 2021 that "partially annulled the award," and instructed that "the amount that ***Ecuador must pay Perenco*** is US$ 374,373,154.25, plus the interest generated until the time of payment."[17]  *Id.*  He recited Ecuador's agreement "to pay the Award unconditionally, voluntarily, and in full, within a period of 60 days" from the Decision "without said payment being subject to enforcement procedures."  He nowhere mentioned any set-off of purported income tax, or that the Payment Undertaking or the 60-day payment deadline do not apply, or that Ecuador was free to resist enforcement.

---

[17] The Attorney General correctly calculated the net amounts due to Perenco without interest, but improperly deducted $43,545.99 that Perenco was ordered to pay Ecuador by the Committee as reimbursement for 10% of the costs of the annulment proceeding.

In any event, Ecuador's attempt to disown its Payment Undertaking is irrelevant in light of its other specific promises to pay the Award. The Attorney General represented that "if this Committee were to reject the Request for Annulment submitted by Ecuador, the State **shall proceed to carry out the obligations stemming from that Award**." Stay Tr. 108 (emphasis added). He also endorsed Minister Martínez's statement committing that if "this Committee decides to reject the Request for Annulment of the Award," "Ecuador will honor its obligations stemming therefrom." *Id.* 109. Ecuador's counsel likewise submitted that these statements "clearly say that Ecuador **will pay the amount of the Award** if you reject the Annulment." *Id.* 166 (emphasis added). The Committee did in fact reject the vast majority of Ecuador's application—upholding only two of twenty alleged grounds for annulment—and accordingly Ecuador is bound to pay the amount of the Award.

Ecuador's suggestion that the Payment Undertaking does not preclude a set-off is also contrary to the Undertaking and the record. Ecuador says that it "never made any commitment not to seek [a] setoff," Partial Opp. 3, but that contradicts its promise to pay the Award "unconditionally" and "in full." Ecuador next implies that it has no duty to pay the amounts it seeks to set off because the Tribunal "rejected Perenco-Ecuador's request that 'all amounts paid by Ecuador pursuant to the Award be net of any Ecuadorian tax or other fiscal obligations.'" *Id.* at 3 (quoting Award ¶ 1023(f)); *id.* at 23-24. But this has nothing to do with set-off of alleged income tax claims. Instead, as is common practice in ICSID arbitration, Perenco sought protection against Ecuador subjecting *the Award itself* to purported taxes.[18] Ecuador also asserts

---

[18] *E.g.*, *Siemens v. Argentina*, ICSID Case No. ARB/02/8, Award, February 6, 2007, ¶ 403(11) ("any funds to be paid pursuant to this decision shall be paid in dollars and into an account outside Argentina indicated by the Claimant and net of any taxes and costs"); *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda v. Bolivarian Republic of Venezuela (I)*, ICSID Case No. ARB/11/26, Award, 29 January 2016, ¶ 625(9) ("Damages

that the Award was annulled "on a damages claim related to Petitioner's tax liability," Partial

Opp. 3, but here too Ecuador overreaches.  The Committee held only that the Tribunal had not

stated its reasons for deciding that certain costs were tax-deductible; it did not (and could not

have) second-guessed the merits of that issue, Decision ¶ 574, on which the Ecuadorian courts

confirmed the deductibility of those costs.  Simone Rep. ¶ 102.

In sum, neither the Payment Undertaking, nor Ecuador's submissions to the Committee,

nor its treaty obligations under Article 53 contemplate any conditions on or deductions to the

amount that the Award orders Ecuador to pay and that Ecuador promised to pay.  Accordingly,

the positions asserted by Ecuador before the Committee and this Court are "clearly inconsistent."

*Second*, Ecuador "has succeeded in persuading [the Committee] to accept [its] earlier

position, so that judicial acceptance of an inconsistent position" in this proceeding "would create

the perception that . . . [the Committee] was misled."  *See Maine*, 532 U.S. at 751.  The

Committee stayed enforcement on the condition that Ecuador provide "a letter signed by

Ecuador's Minister of Finance or the official having full authority to bind Ecuador, committing

to pay the Award unconditionally, voluntarily and in full."  Stay Decision ¶ 82(a).  It continued

the stay only after Ecuador provided the undertaking and the Committee was satisfied that it

conformed to the terms it had specified.  *See* Procedural Order No. 2 ¶¶ 5-6.  If this Court now

allows Ecuador to evade paying the Award in full by applying a set-off based on some

alternative interpretation of the Undertaking, it "would create the perception that [the

Committee] was misled" by Ecuador's promise to pay the Award "unconditionally," "in full,"

within 60 days, and "without such payment being . . . subject to enforcement proceedings."

---

awarded pursuant to this Award and all accrued interest shall be paid to Claimants in full and net of any applicable
Venezuelan tax, duty or other charge").

*Third*, Ecuador would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Maine*, 532 U.S. at 751.  The Committee stayed Perenco's enforcement efforts **for over a year** based on Ecuador's Payment Undertaking.  *See* Procedural Order No. 2 (maintaining stay on April 21, 2020); Joint Stipulation ¶¶ 5-6.  That delay resulted not only in Perenco losing out on any opportunities to enforce during that time, but also in Perenco now having to hold new elected officials to the binding commitments made by their predecessors,[19] which the new administration of President Lasso has refused to do.  By contrast, the preceding administration, under President Lenín Moreno, had given the undertaking and even reached a favorable settlement with Perenco's partner Burlington just two months after Ecuador failed to suspend enforcement of Burlington's ICSID award.[20]  The change in administration is legally irrelevant because the Payment Undertaking binds the Republic, but it obviously has significantly prejudiced Perenco as a practical matter.  Ecuador thus should be estopped from now breaking its promise.

### B.      Waiver

Ecuador's commitment to "pay the Award . . . unconditionally, voluntarily, and in full," and "without such payment being . . . subject to enforcement proceedings" also waives any defenses to enforcement of the full amount awarded.

---

[19] *Ecuador's Lasso Takes Office on Vows to Address Economic Crisis*, Reuters (May 24, 2021), https://www.reuters.com/world/americas/ecuadors-lasso-takes-office-vows-address-economic-crisis-2021-05-24/ (last visited 9/20/21)

[20] *See Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Stay of Enforcement, August 31, 2017, ¶ 88; Press Release, Ecuador, *End to Oil Dispute:  Ecuador and Burlington Reach a Settlement Agreement, Procuraduria General del Estado – Republica Del Ecuador* (Dec. 4, 2017), https://perma.cc/L3TU-GKB7 (net amount awarded to Burlington was around $338 million); Press Release, ConocoPhillips, *ConocoPhillips and the Republic of Ecuador Agree to Settlement of ICSID Award* (Dec. 4, 2017), https://perma.cc/V4JD-Z5LW (Ecuador agreed on December 4, 2017, to pay $337 million, and made an initial $75 million payment on December 1).

Waiver is a party's "intentional relinquishment or abandonment of a known right," *Zuckerman Spaeder, LLP v. Auffenberg*, 646 F.3d 919, 922 (D.C. Cir. 2011). Courts calibrate their application of that standard based on the "right at stake." *United States v. Olano*, 507 U.S. 725, 733 (1993). While Perenco has not located any precedent establishing the standard for a post-award waiver of defenses to enforcement, Ecuador's undertaking would satisfy even the strictest scrutiny, reserved for waivers of a criminal defendant's constitutional rights, because it was made "knowingly and voluntarily." *E.g.*, *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 200 (D.C. Cir. 2013).

Here, Ecuador relinquished its right to oppose enforcement of the Award and to seek a set-off. Ecuador's Payment Undertaking was given solemnly and deliberately, at the direction of the Committee, in order to secure a stay of enforcement. Ecuador's Minister of Finance—who was "the top-level official in charge of public finances," as the Attorney General emphasized, Stay Tr. 14, Friedman Decl., Ex. 1—personally signed the undertaking, at the Committee's instruction that it be signed by him, or by "the official having full authority to bind Ecuador." Stay Decision ¶ 80(a).

The terms of the Payment Undertaking plainly released any defenses Ecuador may have had to enforcement. By pledging to pay the Award "unconditionally" and "in full," Ecuador waived any arguments that the Award should be subject to any conditions or deductions. By pledging to pay the Award "voluntarily" without "such payment being . . . subject to enforcement proceedings," Ecuador waived its right to resist enforcement. The Attorney General's July 2021 instructions to the President that "Ecuador must pay Perenco" the full Award amount confirms Ecuador's waiver. Salvador Letter, Friedman Decl., Ex. 4. If ever there was a case for waiver, this is it.

Indeed, Ecuador has not denied that the ***effect*** of the Payment Undertaking is to bar any opposition to enforcement.  Ecuador (mistakenly) argues only that its undertaking were not triggered because it should not apply to a partially-annulled Award, Partial Opp. 3, but not that the undertaking would permit Ecuador to resist enforcement if it had been triggered.

## IV.  <u>The Revenue Rule Bars Ecuador's Tax Claim Set-Off</u>

Even if Section 1650a permitted set-offs against ICSID awards, and even if Ecuador's set-off were not estopped and waived, it would still fail because the revenue rule is a complete bar to Ecuador's attempt to set off foreign tax claims in this Court.

"The revenue rule is a long-standing common law rule that prevents the courts of one sovereign from enforcing or adjudicating tax claims from another sovereign."  *BCB Holdings Ltd.*, 110 F. Supp. 3d at 249; *see also Pasquantino v. United States*, 544 U.S. 349, 361 (2005) ("a suit to enforce a tax judgment" is an "example[] of actions traditionally barred by the revenue rule"); *Eur. Cmty. v. RJR Nabisco, Inc.*, 424 F.3d 175, 180 (2d Cir. 2005) (Sotomayor, J.) (Under the revenue rule, "the courts of one nation will not enforce final tax judgments or unadjudicated tax claims of other nations.").  The rule avoids "judicial evaluation of the policy-laden enactments of other sovereigns," *Pasquantino*, 544 U.S. at 368, recognizing that foreign policy is largely committed to the Executive, with specific powers, like ratifying treaties, assigned to Congress, *Att'y Gen. of Canada v. R.J. Reynolds Tobacco Holdings*, 268 F.3d 103, 114 (2d Cir. 2001).  The United States has not ratified any such treaty to authorize U.S. courts to enforce Ecuadorian tax claims.

Ecuador's admission that its request for a set-off is meant to fulfill Ecuador's "basic obligation as a sovereign State to ***seek the collection of unpaid taxes***" is damning.  Partial Opp. 3 (emphasis added).  That is exactly what the revenue rule prohibits.  The complex dispute in which Ecuador seeks to embroil the Court—spanning almost two decades in local courts and, in

this Court, involving over 171 pages of expert and fact witness testimony on Ecuadorian tax law and procedure,[21]—illustrates why the revenue rule exists in the first place.

The revenue rule is black letter law that completely bars Ecuador's only defense to enforcement, and yet Ecuador *does not even mention it*. Instead, it merely cites *Micula* for the proposition that a "tax liability may be used to offset an ICSID award." Partial Opp. 3. The parties in *Micula* did not argue, and the Court nowhere addressed, the revenue rule, nor did the Court ultimately set off foreign tax debts. *See June Med. Servs. LLC v. Russo*, 140 S. Ct. 2103, 2147 (2020) ("Questions merely lurk[ing] in the record, neither brought to the attention of the court nor ruled upon, are not considered as having been so decided as to constitute precedents." (quotation marks omitted)). *Micula* did not and could not *sub silentio* overrule over a century of precedent. *See Pasquantino*, 544 U.S. at 360-61, 365-66 (tracing origins of the revenue rule to 18th century English common-law cases and explaining that the modern iteration of the rule was developed in "the late 19th and early 20th century").

Moreover, to the extent that Ecuador seeks to avoid the revenue rule by suggesting that Ecuadorian law should apply to determine enforceability, *see* Partial Opp. 27 & n.23, Ecuador is wrong. That choice of law issue—like the revenue rule—was not meaningfully argued or decided in *Micula*. 404 F. Supp. 3d at 283-84. In fact, federal common law and D.C. law govern the enforceability of foreign judgments and claims in this Court.[22] And under those laws, as applicable here, the revenue rule suffices to dispose of Ecuador's request in its entirety.

---

[21] *See* Coronel Expert Report, ECF No. 22; Ordóñez Declaration, ECF No. 23; Colombel Decl.; Simone Rep.

[22] *See* Restatement (Second) of Conflicts of Laws § 128 cmt. b (1971) (whether a defendant seeking a set-off "has a claim to assert" "is determined by the otherwise applicable law"); *RJR Nabisco, Inc.*, 424 F.3d at 180 (revenue rule bars U.S. courts from enforcing foreign tax judgments); *Commissions Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 332 (D.C. Cir. 2014) ("the recognition of foreign judgments is governed by state law").

**V.     Ecuador Cannot Satisfy Even the Basic Requirements for Enforcing Foreign Judgments in U.S. Courts or for an Equitable Set-Off**

Even if Ecuador could somehow overcome all of the preceding obstacles, it still would not be permitted to interpose the tax set-off.  *First*, Ecuador cannot meet the prerequisites for enforcing a foreign judgment.  *Second*, Ecuador is not entitled to an equitable set-off.

**A.     The Ecuadorian Tax Judgments Are Not Entitled to Recognition in a U.S. Court**

Ecuador has not established any affirmative basis for enforcing the judgments that it claims "fully adjudicated" Perenco's tax liability, Partial Opp. 29, as it must in order to obtain a set-off.  Because a set-off  "effectively adjudicates" the claim sought to be set off, consistent with the Due Process Clause, no set-off can issue unless Ecuador establishes a valid claim for enforcement of the judgments.  *See MCI Telecom. Corp. v. F.C.C.*, 59 F.3d 1407, 1418 (D.C. Cir. 1995) (holding FCC's policy of applying set-offs "effectively adjudicates" the claim sought to be set off); *see also Nashville Lodging Co. v. Resol. Tr. Corp.*, 59 F.3d 236, 246-47 (D.C. Cir. 1995) (denying a debtor's request for a set-off because it did not have a valid contract claim against the creditor).  Ecuador does not argue otherwise, and in fact concedes that this Court must examine whether the judgments present "a valid liability."  Partial Opp. 27.  Ecuador's citations to generic statements about the concept of set-off in very different circumstances obviously cannot rebut the insuperable problems with the particular set-off Ecuador seeks here. Partial Opp. 21-23; *e.g.*, *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 18-19 (1995) (addressing whether a litigant had exercised its undisputed rights under Maryland law to effect a set-off); *Thai Lao Lignite (Thailand) Co. v. Gov't of the Lao People's Democratic Republic*, No. 10CV5256KMWDCF, 2016 WL 958640, at *2 (S.D.N.Y. Mar. 8, 2016) (applying New York's set-off statute and precedent, not a federal court's inherent equitable set-off power).

Ecuador has no basis for enforcing the Ecuadorian tax judgments.  Ecuador did not even attempt to show that its judgments are entitled to recognition as a matter of comity.  And D.C.'s Uniform Foreign-Country Money Judgments Recognition Act of 2011 (the "Recognition Act"), D.C. Code §§ 15-361–15-371,—in line with the revenue rule—"does not apply" to a "[j]udgment for taxes."  D.C. Code § 15-363(b)(1).

### 1.  The Ecuadorian Tax Judgments Are Not Enforceable as a Matter of International Comity

Ecuador cannot bear its burden of proving that the judgments it seeks to set off may be enforced under comity principles.  Comity "is a matter of judicial discretion," *Commissions Imp. Exp. S.A. v. Republic of Congo*, No. CV 13-00713 (RJL), 2015 WL 13667748, at *2 (D.D.C. July 6, 2015), and Ecuador, as the "party seeking recognition of the judgment[s,] bears the burden of proof."  *de Csepel v. Republic of Hungary*, 714 F.3d 591, 607 (D.C. Cir. 2013).  In determining whether to accord comity to a foreign judgment, courts apply the well-known standard set forth in *Hilton v. Guyot*, 159 U.S. 113 (1895).  *See Csepel*, 714 F.3d at 606; *In re Wilde*, 68 A.3d 749, 763 (D.C. 2013).  In that case, the Supreme Court established that U.S. courts should grant comity only if:

> there has been opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect.

*Hilton*, 159 U.S. at 202-03.  In addition, a foreign judgment will not be enforced if it is "repugnant to fundamental notions of what is decent and just in the State where enforcement is sought," *Csepel*, 714 F.3d at 606, or is not "a final judgment according to the jurisdiction in

which it was rendered," *Ricart v. Pan Am. World Airways, Inc.*, No. CIV. A. 89-0768(HHG), 1990 WL 236080, at *1 (D.D.C. Dec. 21, 1990).

Ecuador has not even attempted to meet its burden to prove that the judgments are enforceable as a matter of comity.  It cannot do so for the first time in its reply brief.  *Washington v. AlliedBarton Sec. Servs., LLC*, 748 F. App'x 348, 349 (D.C. Cir. 2018) (an argument first raised in a reply brief is forfeited); *Nat'l R.R. Passenger Corp. v. Se. Pennsylvania Transportation Auth.*, 518 F. Supp. 3d 19, 30 (D.D.C. 2021) (same).

In any event, Ecuador could not bear its burden to show that the judgments should be accorded comity.  *First*, Ecuador seeks to enforce against Perenco assessments for fiscal years 2002-2005 that local courts did not allow Perenco to contest on the merits.  Colombel Decl. ¶¶ 57, 65.  But comity requires the "opportunity for a full and fair trial."  *Hilton*, 159 U.S. at 202-03; *see also Int'l Transactions, Ltd. v. Embotelladora Agral* , 347 F.3d 589, 594 (5th Cir. 2003) (the judgment-debtor must have had a "reasonable opportunity to be heard").  That standard plainly was not satisfied when the Ecuadorian courts refused to admit Perenco's challenge to the assessments for alleged lack of standing, in violation of Ecuadorian law, as Professor Simone explains. Simone Rep. ¶¶ 15(b), 86-94.  *See Maersk, Inc. v. Neewra, Inc.*, No. 05 CIV. 4356 (CM), 2010 WL 2836134, at *15 (S.D.N.Y. July 9, 2010) (no preclusive effect accorded to a Kuwaiti judgment where the appellate court had "declined to consider [a party's] documents on procedural grounds" and affirmed the trial court "without wrestling with the merits"), *aff'd* 450 F. App'x 3 (2d Cir. 2011); *United States v. Sum of $70,990,605*, 991 F. Supp. 2d 154, 169 (D.D.C. 2013) (Afghan proceeding lacked due process where there was no sign a party "had the opportunity to produce evidence").  Indeed, even the Ecuadorian District Tax Court recently acknowledged that two of these assessments could not be enforced against

Perenco because, among other things, Perenco was denied its day in court.  Colombel Decl. ¶ 65; Simone Rep. ¶¶ 15(b), 63(a), 67-68.

*Second*, this Court does not afford comity absent "a final judgment according to the jurisdiction in which it was rendered."  *Ricart*, 1990 WL 236080, at *1.  Ecuador itself admits that the tax claims for which it seeks a stay are not final, and, as Professor Simone explains, an appeal is still pending for one of the judgments Ecuador claims "has been fully adjudicated," Partial Opp. 29; Simone Rep. ¶¶ 58-68.  The "rationale underlying the grant of comity," namely that "the results of the litigation process should be final" "once the parties have had an opportunity to present their cases fully and fairly before a court of competent jurisdiction," *Int'l Transactions, Ltd.*, 347 F.3d at 593, is not served by enforcing judgments that are still wending their way through foreign courts.

*Finally*, from 2007 to 2018, when Perenco's alleged tax liability was being adjudicated in Ecuador, the government unlawfully replaced judges who ruled in favor of oil companies and undermined the independence of its judiciary so severely that Perenco was not accorded a fair hearing.  *See Hilton*, 159 U.S. at 202-03 (judgments cannot be enforced absent "a system of jurisprudence likely to secure an impartial administration of justice," and no evidence of "prejudice in the court"); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 609 (S.D.N.Y. 2014) (foreign system must be "fundamentally fair"), *aff'd*, 833 F.3d 74 (2d Cir. 2016).

The Correa administration openly threatened judges with sanctions if they ruled against the government, hundreds of judges were replaced (including all the members of the former Supreme Court), and two judges of the National Court of Justice who ruled against the Ecuadorian SRI were unlawfully removed, to be reinstated only in 2020.  *See* Simone Rep. § V.C.  President Correa was unabashed about his administration's intent to "get our hands on

the courts."[23]  The international community, including the U.S. State Department and leading

NGOs, has roundly and forcefully condemned President Correa's capture of the judiciary.[24]

One high-profile example of how unreliable the Ecuadorian courts were during this

period is the Lago Agrio saga.  In that case, a group of lawyers led by Steven Donziger sued

Chevron on behalf of indigenous peoples that were harmed by environmental damage caused by

its predecessor.  *Chevron Corp.*, 974 F. Supp. 2d at 383-84.  An Ecuadorian judge accepted a

bribe of $500,000 to "rule in their favor and sign" a judgment that the plaintiffs' representatives

themselves had written.  *Id.* at 384.  The Ecuadorian appellate courts refused to consider

Chevron's arguments that the judgment had been ghostwritten, and affirmed ***$8.646 billion*** in

damages.  *Id.* at 537-40.  Chevron sought relief against Ecuador before an arbitration panel

constituted under the auspices of the Permanent Court of Arbitration at The Hague and against

Donziger and others in the U.S. District Court for the Southern District of New York.  The

arbitration panel held that Ecuador was liable for denial of justice for failing to stop enforcement

of the ghostwritten judgment procured by bribery.[25]

---

[23] José Miguel Vivanco, Executive Director Americas Division, *Letter on Judicial Independence in Ecuador*, Human Rights Watch, Jan. 29, 2014, https://perma.cc/9RGX-3GED.

[24] *See, e.g.*, U.S. State Department, Country Reports on Human Rights Practices for 2007, Ecuador, at 7 ("in practice the judiciary was susceptible to outside pressure and corruption," and "the outcome of trials appeared predetermined") https://perma.cc/2MKY-L2BK; U.S. State Department, Country Reports on Human Rights Practices for 2011, Ecuador, at 7, https://perma.cc/QF3M-7M2X (same); José Miguel Vivanco, Executive Director Americas Division, *Letter on Judicial Independence in Ecuador*, Human Rights Watch Jan. 29, 2014, https://perma.cc/9RGX-3GED ("express[ing] our concern regarding the ongoing judicial reform process in Ecuador, which poses a very serious threat to judicial independence in the country" and noting that "corruption, inefficiency, and political influence have plagued Ecuador's judiciary for years"); Human Rights Watch, Ecuador: *Political Interference in the Judiciary*, Apr. 20, 2018, https://perma.cc/W4W5-G3HJ (describing evidence "that strongly suggest[s] a pattern of government efforts to pressure or coerce the judiciary in its handling of important or politically sensitive cases during the Correa administration," including a high-level Justice Ministry official generating a list of judicial candidates "identified" as "dangerous cases" for not being aligned with Correa); World Bank, *Worldwide Governance Indicators*, https://databank.worldbank.org/reports.aspx?dsid=3&series=RL.PER.RNK (assessing Ecuador's rule of law percentile rank at 10.8 out of 100 in 2011) (Last accessed on Sept. 20, 2021).

[25] *Chevron Corp. and Texaco Petroleum Company v. Ecuador*, PCA Case No. 2009-23, Second Partial Award on Track II, ¶¶ 10.5-10.6, Aug. 30, 2018, https://perma.cc/32W8-KM68.

The U.S. district court similarly held, in a detailed post-trial opinion, that the judgment had been "procured by fraud" and enjoined its enforcement.  974 F. Supp. 2d at 384-85.  The U.S. district court refused to accord comity to those Ecuadorian decisions in part because it concluded that the Ecuadorian judicial system "was not fair or impartial and did not comport with the requirements of due process," from 2004 through the date of the decision in 2014, based largely on the same shocking facts outlined in Professor Simone's report.  *See Chevron Corp.*, 974 F. Supp. 2d at 610; *id.* at 608-17.  The court also noted that President Correa at his inauguration "refused to swear to respect and submit to the Constitution of the Republic," and said publicly that "the Judicial Branch depends on the Executive Branch.  If I don't give it money it has no means to act . . . ."  *Id.* at 611.  The court concluded that as a result of President Correa's continued interference, "judges have been threatened with violence, removed, and/or prosecuted when they ruled against the government's interests," and that the "Correa administration has targeted large foreign companies in particular."  *Id.* at 612.

There is simply no basis for concluding—and Ecuador has not even tried to prove—that Perenco's tax liability was adjudicated by a fair and impartial judiciary deserving of comity.

## 2.  D.C. Law Prohibits Enforcing the Ecuadorian Tax Judgments

For the same reasons, Ecuador could not seek solace in the D.C. Recognition Act.  That Act excludes tax judgments.  D.C. Code § 15-363(b)(1).  While it contains a saving clause, that clause relies on the same comity principles just addressed.  *See* D.C. Code § 15-371 (Act "does not prevent the recognition under principles of comity or otherwise of a foreign-country judgment not within the scope of this subchapter").

Moreover, Ecuador's attempt to enforce the allegedly final judgments is specifically prohibited by D.C. law.  An action on a foreign judgment "is barred if by the laws of that jurisdiction, the action would there be barred and the judgment or decree would be incapable of

being otherwise enforced there."  D.C. Code § 12-307; *see also* Restatement (Fourth) of Foreign Relations Law § 481, cmt. d (2018) ("A foreign judgment is entitled to recognition in the United States only if the judgment is . . .  enforceable under the law of the country in which it was rendered.").  A judgment is enforceable when "the legal procedures of the foreign state to ensure that the judgment debtor complies with the judgment are available to the judgment creditor to assist in collection of the judgment." Restatement (Fourth) of Foreign Relations § 481, cmt. d.

That requirement is not met here. The Ecuadorian courts have annulled two of the SRI's four attempts to enforce tax judgments that Ecuador claims are "fully adjudicated" and a third will not be enforced while Perenco's appeal is pending, leaving just *one* judgment, for approximately $14 million.  Even the liabilities that have not yet been annulled, however, should not be enforceable against Perenco because Perenco has not had its day in court to contest them, as Ecuador's own District Tax Court recently recognized.  *See* Colombel Decl. ¶¶ 64-65; Simone Rep. ¶¶ 15(b), 63-70.  D.C. law precludes Ecuador from attempting an end-run around these Ecuadorian law limitations.

### B.    Even if Ecuador Had Valid Claims for Enforcement of Ecuadorian Tax Judgments, They Could Not Be Set Off Against the Award

Even if Ecuador were to meet the Herculean task of overcoming all the obstacles set forth above, Ecuador would still fail to meet the requirements for an equitable set-off.  Ecuador has not satisfied either of the two cumulative conditions, namely that (*i*) a set-off is necessary to promote justice and (*ii*) Ecuador's debt on the Award and Perenco's alleged debts on the judgments are mutual.

*First*, an equitable set-off is available only where "the party seeking it shows some equitable ground therefor, and its allowance is necessary in order to promote justice."  80  C.J.S., *Set–Off and Counterclaim* § 6 (updated 2021); *see also, e.g.*, *United States v. York*, 909 F. Supp.

4, 8 (D.D.C. 1995) (set-off "is grounded in the equity power of the court"). That is a high bar, and Ecuador has not met it. Applying a set-off to an Award that Ecuador must "abide by and comply with" under Article 53 of the ICSID Convention and has promised to pay "unconditionally, voluntarily and in full" and "without such payment being . . . subject to enforcement proceedings," would undermine, not promote, the interests of justice. *See*, *supra*, Section III. Ecuador says that the requested set-off would be "fair and appropriate" because "Perenco-Ecuador's income tax liability arose out of the same transaction as the ICSID arbitration," Partial Opp. 23, but that is misleading given that the present action concerns only award enforcement, has no real bearing on the fairness and justice of the set-off Ecuador seeks, and only underscores the injustice of Ecuador undermining the ICSID Convention system by now seeking to litigate in a U.S. court reductions to an ICSID award based on dubious claims it chose not to raise in the ICSID arbitration.

Ecuador makes Perenco's supposed insolvency a central refrain of its submission, Partial Opp. 27-28, but it misrepresents the facts on which it relies. *See generally* Colombel Decl. § V; Simone Rep. ¶¶ 71-72, § V.D. Perenco is not insolvent, but is being wound up because it no longer has any local business after Ecuador's expropriation. And the fact that Perenco is in liquidation does not mean that Ecuador will not be able to recover any valid debts—to the contrary, the purpose of the process, which is being supervised by Ecuador's own authorities, is to resolve debts. Ecuador has not even begun enforcement proceedings against Perenco for many of the judgments it claims are final, and so Ecuador is simply wrong to say that it has been "unable" to collect the alleged tax liabilities from Perenco "due to its insolvency." Partial Opp. 19; Simone Rep. ¶¶ 56, 72, 119. Furthermore, Ecuador could seek to enforce the judgments against other Consortium members; there is no indication that it has taken any steps to

do so.  Simone Rep. ¶¶ 71-72, 123; Colombel Decl. ¶ 69.  In any event, Ecuador cannot invoke Perenco's lack of assets in-country as a reason why this Court should exercise its equity power in Ecuador's favor when Ecuador itself unlawfully expropriated all of Perenco's assets, in breach of international law and contract.  Decision on Liability ¶¶ 442, 710, ECF No. 1-3; Colombel Decl. ¶ 68.  As the Tribunal found, "Perenco would likely still be operating both Blocks" had Ecuador not violated its provisional measures order.  Award ¶¶ 979-80.  Instead, Ecuador has made **billions** of dollars in revenue from the Blocks it unlawfully took from Perenco.  Colombel Decl. ¶ 28.

*Second*, Ecuador also cannot satisfy the requirement of mutuality.  Ecuador agrees that "a party can have . . . setoff rights only against one asserting claims against himself," *Nashville Lodging Co.* 59 F.3d at 246, and cites Ecuadorian law to argue that Perenco "is the entity responsible for the income tax liability at issue here."  *See* Partial Opp. 24.  However, Ecuador ignores the principles of Ecuadorian law it seeks to invoke.  *See generally* Simone Rep. § V.E. Under Ecuadorian law, the SRI and Ecuador are two separate entities that are not mutual for purposes of a set-off. This is dispositive of Ecuador's set-off argument for all of the judgments it claims are final, since they all involve debts owed to the SRI and not to the central government that is the Award-debtor here.  In addition, contrary to Ecuador's assertions, Perenco is **not** liable for the judgments arising from the 2002-2005 assessments, which were issued against other entities and for years before the Consortium was formed.  *Id.* ¶ 129; Colombel Decl. ¶¶ 56-58. In fact, the Ecuadorian courts recently confirmed that the 2004-2005 Block 21 assessments cannot be enforced against Perenco because they were addressed to a different entity, Perenco was not allowed to challenge them, and Perenco is not liable to pay them.  Simone Rep. ¶¶ 63(a), 73 (Table No. 2); Colombel Decl. ¶ 65.

## VI.    A Stay of Enforcement Pending the Ecuadorian Tax Proceedings Is Not Warranted

Ecuador is not entitled to a stay pending the resolution of separate tax proceedings that may or may not resolve in its favor at some future date.  Ecuador devotes only one paragraph to its request for a stay and does not identify a single case in which a suit was stayed pending another proceeding that may subsequently permit a set-off.  *See* Partial Opp. 27-28.[26]  Ecuador also omits key parts of the standard governing courts' power to stay proceedings, and fails to justify the indefinite stay it requests by reference to the proper standard.

While Ecuador concedes that a court must weigh both "the court's interests in judicial economy" and "any possible hardship to the parties," it omits that a litigant should be required to await the outcome of another litigation "[o]nly in rare circumstances."  *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 731-33 (D.C. Cir. 2012) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).  Here, the factors that courts assess in striking that balance all weigh in favor of enforcing the full Award at once.  This is not the rare case that merits a stay.

*First*, Ecuador ignores the court's interests in this case, no doubt because a stay pending the litigation of unrelated tax claims would not further judicial economy.  The parties are not "litigating essentially the same issues in two separate forums," such that the outcome of the foreign case "may affect this Court's determinations."  *Masdar Solar & Wind Cooperatief v. Kingdom of Spain*, 397 F. Supp. 3d 34, 39-40 (D.D.C. 2019) (staying enforcement action pending ICSID annulment proceeding where Spain's annulment application "raise[d] many of

---

[26] None of the cases Ecuador cites resemble the facts at issue here. *See Landis v. N. Am. Co.*, 299 U.S. 248, 249 (1936) (announcing standard and remanding for decision whether to stay certain cases challenging validity of a federal statute pending resolution of other cases that would resolve the same issue); *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 732-33 (D.C. Cir. 2012) (holding indefinite stay of proceeding to enforce New York Convention award was abuse of discretion); *9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 19-CV-01871 (TSC), 2020 WL 5816012, at *1 (D.D.C. Sept. 30, 2020) (staying ICSID award enforcement pending ICSID annulment proceeding); *Marsh v. Johnson*, 263 F. Supp. 2d 49, 49 (D.D.C. 2003) (lifting stay of a suit concerning a military officer's non-promotion pending decision by a Navy board convened to reconsider promotion decision).

41

the same arguments that it offers to this Court").  No issue before the Ecuadorian courts—which are considering the correctness of the application of Ecuadorian tax law and procedure—affects the requirements under Section 1650a for enforcing an ICSID award that are before this Court.

*Second*, the balance of the hardships also weighs against a stay.  Ecuador omits that it must "make out a clear case of hardship or inequity," because it requests a stay of "indefinite duration."  *Landis*, 299 U.S. at 255; *see also Belize Soc. Dev.*, 668 F.3d at 731-32; Proposed Order, Aug. 9, 2021, ECF No. 20-2 ("enforcement of the Award is stayed with respect to the amounts of the income tax claims pending in the Ecuadorian courts").  Ecuador's bare assertion that this case might be "the only opportunity for the Republic to satisfy Perenco-Ecuador's income tax liability," Partial Opp. 27, does not establish such hardship, not least because it is not true: any such alleged liability can and will be resolved in Ecuador's supervised liquidation and could be enforced against other members of the Consortium, which Ecuador has not even attempted to do.  Simone Rep. ¶ 71, § V.D.; Colombel Decl. ¶¶ 69-71.  By contrast, an indefinite stay would harm Perenco by imposing "undue delay" on its compensation for Ecuador's breaches more than 14 years ago.  *See Belize Soc. Dev.*, 668 F.3d at 732.

*Finally*, even when seeking a stay of a New York Convention award during proceedings to annul that very award, courts still must take into consideration "the general objectives of arbitration."  *LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 879–80 (D.C. Cir. 2021).  When doing so, "the expeditious resolution of disputes and the avoidance of protracted and expensive litigation," and "the status of the foreign proceedings and the estimated time for those proceedings to be resolved" weigh against a stay.  *Id.*  Perenco filed its notice of arbitration ***more than 13 years ago*** (in April 2008), the Award was issued ***almost two years ago*** (on September 27, 2019), the deadline for Ecuador to pay it in full was ***almost two months ago*** (on July 27,

2021), and enforcement of the pending Ecuadorian tax claims will not be finally resolved for ***at least several more years***.  Simone Report ¶¶ 13-14, 57-70.  The D.C. Circuit and this Court hold that far shorter delays weigh against a stay.  *LLC SPC Stileks*, 985 F.3d at 880 (upholding denial of stay in part because notice of arbitration was filed "more than 10 years ago" and a stay may have entailed a delay of "several additional years"); *see also Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 72 (D.D.C. 2013) (denying stay in June 2013 where set-aside proceeding "will likely not be resolved until late 2013 or early 2014" and notice was filed over six years prior), *aff'd*, 795 F.3d 200 (D.C. Cir. 2015); *Gold Rsrv. Inc. v. Bolivarian Republic of Venezuela*, 146 F. Supp. 3d 112, 135 (D.D.C. 2015).

This Court should thus deny Ecuador's request for a stay and immediately enforce the Award.  However, if this Court were to impose a stay, then it should enter judgment on the full Award and stay execution only as to the pending proceedings, *see* Fed. R. Civ. P. 62(a) (execution is stayed for 30 days post-judgment "unless the court orders otherwise"), since even on Ecuador's case the bulk of the Award is immediately enforceable, *see* Proposed Order, Aug. 9, 2021, ECF No. 20-2 (requesting stay only "with respect to the amounts of the income tax claims pending in the Ecuadorian courts").  Likewise, if the Court considers that further proceedings on Ecuador's request for a set-off are necessary, it should enter judgment on the Award immediately, and stay execution only as to the amount sought to be set off, to implement the parties' agreement that the bulk of the Award is enforceable.

## VII.    Perenco Is Entitled to Post-Award Interest at the Rate Awarded by the Tribunal

The Tribunal specified that post-award interest "will accrue" at the rates specified in the Award until "the date of full and final payment."  Award, ¶ 1023(a)-(e), ECF No. 1-2.  Ecuador's request to instead provide for interest following a judgment by this Court to accrue at the lower

rate that 28 U.S.C. § 1961(a) generally provides for civil money judgments contravenes both Section 1650a and its agreement that the post-award rate applies until "full and final payment."

Ecuador cites two decisions by this Court holding that Section 1961(a) applies to a judgment on an ICSID award unless the award "explicitly state[s] the interest rate to be applied 'post-judgment,'"[27] but those decisions are not binding and contravene the plain terms of Section 1650a.  Section 1650a provides that courts "shall" enforce "the pecuniary obligations" contained in an ICSID award, 22 U.S.C. § 1650a, including post-award interest.  *Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela*, No. 14 CIV. 8163 PAE, 2015 WL 926011, at *1-2 (S.D.N.Y. Mar. 4, 2015) (reversed on other grounds).  An award of interest until "full and final payment" by its terms applies until the award is paid, regardless whether it is reduced to a judgment in the interim.  Section 1650a provides no basis for requiring an ICSID tribunal to use the magic words "post-judgment interest" to make that clear.

A contrary reading of Section 1650a would create "the likelihood[] of different interest rates applying in different countries in which an arbitral award creditor sought to recognize and enforce the same ICSID award," an "incongruous, confusing, and potentially discordant outcome."  *Id.* at *2.  Reducing the interest award in favor of the award-creditor also has the perverse effect of reducing the costs of failing to comply with an arbitral award.  Section 1650a's specific provisions on enforcement of ICSID awards should thus supplant Section 1961(a)'s more general provision for interest on money judgments.  *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (specific statutes provisions govern general ones).

---

[27] Partial Opp. 28-29 (citing *Tenaris, S.A. v. Bolivarian Republic of Venezuela*, No. 1:18-CV-01373 (CJN), 2021 WL 1177996, at *2 (D.D.C. Mar. 29, 2021); *OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela*, No. CV 16-1533 (ABJ), 2019 WL 2185040, at *6 (D.D.C. May 21, 2019)).

Furthermore, as Ecuador concedes, this Court's contrary decisions have recognized that the tribunal's rate may be applied when the parties agree to it by "clear, unambiguous, and unequivocal language."  Partial Opp. 28-29 (citing *Tenaris, S.A.*, 2021 WL 11779962015, at *2).  Here, the Parties agreed in a Supplemental Joint Status Report that the net amount due to Perenco under the Award as of July 27, 2021—$391,393,984—is "subject to additional post-Award interest *until full and final payment*."  ECF No. 17, at 2 (emphasis added); *see also* Salvador Letter, Friedman Decl., Ex. 4, at 2 (instructing that "the amount that Ecuador must pay Perenco is US$ 374,373,154.25, plus the interest generated until the time of payment").  Ecuador now objects to the Prayer for Relief in the Petition because it "repeats the language" from the Award providing for interest to accrue "until full and final payment," Partial Opp. 28, but it adopted that very same phrase in the joint report.  Accordingly, Ecuador itself agreed that the Tribunal's rate, not that of Section 1961(a), should apply post-judgment.

## CONCLUSION

Perenco's Petition and Ecuador's Cross-Motion are both fully briefed, and Ecuador's attempts to resist enforcement of the Award can all be dismissed as a matter of law, for the reasons discussed above.  Perenco respectfully requests that this Court grant Perenco's Petition, deny Ecuador's Cross-Motion, enter judgment for Perenco and against Ecuador, and issue an order:

(a)     Recognizing and enforcing the Award, as modified by the Decision, and entering judgment on the pecuniary obligations in the Award in the same manner and with the same force and effect as if the Award were a final judgment of this Court;

(b)     Ordering Ecuador, in accordance with the pecuniary obligations in the Award, to pay to Perenco $392,665,310, plus interest at the rates the Award specifies accruing from September 20, 2021, until full and final payment.

Dated:  September 20, 2021


Of Counsel:                                           /s/ Mark W. Friedman

Ina C. Popova                                        Mark W. Friedman

Laura Sinisterra                                     (D.D.C. Bar No. NY0328)

Natascha Born                                        Debevoise & Plimpton LLP

Debevoise & Plimpton LLP                             919 Third Avenue

919 Third Avenue                                     New York, NY 10022

New York, NY 10022                                   (212) 909-6000

(212) 909-6000                                       mwfriedman@debevoise.com

ipopova@debevoise.com

lsinisterra@debevoise.com                            *Attorneys for Petitioner*

nborn@debevoise.com                                  *Perenco Ecuador Limited*